James W. DUNCAN, Jr., Timothy
S. Smick, et al, Plaintiffs
Below, Appellants,

v.

THERATX, INCORPORATED,
Defendant Below,
Appellee.

No. 575, 2000.

Supreme Court of Delaware.

Submitted: May 8, 2001.
Decided: June 1, 2001.

Stephen W. Spence, of Phillips, Goldman & Spence, P.A., Wilmington; Robert L. Rothman (argued), of Arnall Golden Gregory, L.L.P., Atlanta, Georgia, of counsel, for Appellants.

William O. LaMotte III (argued), William M. Lafferty, and Matthew Neiderman, of Morris, Nichols, Arsht & Tunnell, Wilmington; R. Laurence Macon, P.C., Rebecca Simmons, Jo Beth Eubanks, of Akin, Gump, Strauss, Hauer & Feld, L.L.P., San Antonio, Texas, of counsel, for Appellee.

Before VEASEY, C.J., WALSH and BERGER, JJ.

VEASEY, Chief Justice:

In this certification proceeding, we resolve a novel question of Delaware law certified to this Court by the United States Court of Appeals for the Eleventh Circuit in accordance with Article IV, Section 11(9), of the Delaware Constitution and Supreme Court Rule 41. The certified question concerns the appropriate method of calculating contract damages where an issuer's temporary suspension of a shelf registration prevents trading by stockholders in violation of the terms of a merger agreement. Specifically, the question posed is:

> What is the proper measure of damages when a defendant's contractual obligation to cause a shelf registration, under which plaintiff is entitled to trade a restricted stock, to remain in effect for a specified period of time is breached by defendant's temporary suspension of plaintiffs' ability to trade the restricted stock?

We conclude that, under Delaware law, contract damages in this situation are measured by calculating the difference between (1) the highest intermediate price of the shares during a reasonable time at the beginning of the restricted period, which functions as an estimate of the price that the stockholders would have received if they had been able to sell their shares, and (2) the average market price of the shares during a reasonable period after the restrictions were lifted. This damages rule provides a suitable approximation of the damages that the stockholders incurred as a result of the breach, while allocating exclusively to the stockholders who elect to retain their shares after reinstatement of the shelf registration the risk of subsequent positive and negative share price changes.

### *Facts*

As part of a 1994 merger between TheraTx, Inc. and PersonaCare, Inc., PersonaCare shareholders received restricted, un-

registered shares in TheraTx.[1] The merger agreement provides that Delaware law governs "the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties." Under the merger agreement, TheraTx was required to file a shelf registration, to last for two years, that would permit holders to trade these shares in the event that TheraTx elected to undertake a public offering. On June 24, 1994, TheraTx conducted an initial public offering of its shares and, in accordance with its obligations under the agreement, TheraTx filed a shelf registration for the restricted shares that became effective on December 12, 1994.

On January 13, 1995, one month after trading began in the restricted shares, TheraTx purchased Southern Management Services, Inc. Because this merger was a material change requiring an amendment to the shelf registration, the Securities and Exchange Commission advised TheraTx to suspend the shelf registration and to reimpose the trading restrictions on the shares held by the former PersonaCare stockholders. The suspension took effect on January 13, 1995 and continued until June 30, 1995. During this period, the TheraTx share price reached a high of $23⅛ and then fell to $13⅜ at the time that the shelf registration was reinstated. In March 1997, Vencor, Inc. purchased TheraTx in a tender offer for $17.10 per share.

James Duncan and other former PersonaCare stockholders (collectively, "the Duncan Group") sued TheraTx in the District Court for the Northern District of Georgia for breach of the merger agreement. The District Court found that the suspension of trading constituted a breach of the merger agreement and awarded damages equal to the highest share price during the ten day period following the suspension of trading ($19.75), reduced by the actual sale price that each plaintiff actually obtained for the shares.[2] The Eleventh Circuit agreed that TheraTx breached the agreement, but certified to this Court the above question concerning the proper method of calculating the damages from the breach.

### Determining the Appropriate Measure of Damages

■ The question certified by the Eleventh Circuit requires us to determine the appropriate default measure of damages under Delaware law for an issuer's breach of a merger agreement that results in a temporary restriction on certain stockholders' ability to sell their shares. Questions certified for resolution by the Court under Supreme Court Rule 41 are determined as a matter of law on the undisputed facts submitted by the certifying court in its Certificate of Questions of Law.[3]

■ We begin with the basic proposition that default damages rules, like other contract rules, should generally reflect the contract term that most parties would have bargained for at the time of the agreement.[4] Applying this principle to the

---

1. These facts are adapted from the Certificate of Questions of Law submitted by the Eleventh Circuit. *See TheraTx, Inc. v. Duncan,* 11th Cir., 234 F.3d 1240, 1250–51 (2000).

2. *TheraTx, Inc. v. Duncan,* N.D.Ga., C.A. No. 1:95–CV–3193 (Feb. 25, 1999) (ORDER). Members of the Duncan Group sold their shares at various times, and thus at various prices, after the shelf registration was reinstated.

3. *See Chaplake Holdings, Ltd. v. Chrysler Corp.,* Del.Supr., 766 A.2d 1, 3 (2001); *Rales v. Blasband,* Del.Supr., 634 A.2d 927, 931 (1993).

4. *See* Ian Ayres & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory,* 99 Yale L.J. 87, 91 (1989); Charles J. Goetz & Robert E. Scott, *The Mitigation Principle: Toward a General Theory of Contractual Obligation,* 69 Va. L.Rev. 967, 971 (1983) ("Ideally, the preformulated rules supplied by

present case, the Court must identify the damages rule that, when viewed from the time of the merger agreement, provides the stockholders with adequate compensation for a breach and provides both parties with the appropriate incentive to minimize joint losses from the breach.[5]

█ As both parties recognize, the standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract.[6] Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost.

█ The merger agreement in the present case entitled the Duncan Group members to trade their shares for a period of two years. Under this provision, the Duncan Group members reasonably expected to have the maximum freedom to choose when to trade their shares during this period and at what price. The breach of the merger agreement by TheraTx, however, caused this expectation to be disappointed.[7]

The stockholders' lost expectation interest in this situation is the reduction in the stockholders' presumptive capital gains attributable to the trading restrictions. The magnitude of this reduction is, in theory, the difference between the market price of the shares at the time that the stockholders could have sold the shares in the absence of the restrictions and some measure of the value of the shares after restrictions were lifted. Because these determinations are necessarily hypothetical, the question becomes: (1) How best to estimate what

---

the state should mimic the agreements contracting parties would reach were they costlessly to bargain out each detail of the transaction."). Because majoritarian default rules reduce transaction costs, they are preferred—unless there is a reason to select a "penalty default" rule that forces parties with superior information to disclose some of that information by opting out of the default rule. *See* Ayres & Gertner, *supra*, at 95–99 (explaining function of penalty default rules): *see also* Richard Posner, Economic Analysis of the Law 85 (3rd ed.1986) (observing that positive costs are associated with opting out of a disfavored default rule).

5. *See* Goetz & Scott, *supra* note 4, at 973 ("The resulting mitigation principle would require each contractor to extend whatever efforts in sharing information and undertaking subsequent adaptations that are necessary to minimize the joint costs of all readjustment contingencies.").

6. *See* Restatement (Second) of Contracts § 347 cmt. a ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will ... put him in as good a position as he would have been in had the contract been performed.").

7. The injury here is not the loss of a specific transaction but the loss of the ability to trade the shares as desired. As the District Court recognized, because the primary effect of the breach is to cause a "deprivation of [the stockholder's] range of elective action," the plaintiff is not required to show that she actually would have sold the shares during the restricted period. *American General Corp. v. Continental Airlines Corp.*, Del. Ch., 622 A.2d 1, 10, *aff'd*, Del.Supr., No. 251, 1992, 620 A.2d 856, Moore, J. (1992) (ORDER); *see also TheraTx*, Order at 6. We find unpersuasive the TheraTx argument that the injury in this case is the loss of a particular sale and that, under Delaware law, "[h]ad it been proven at trial that the members of the Duncan Group intended to hold the TheraTx stock for a long term investment ... they would have suffered no deprivation during the suspension, and would not be entitled to damages at all." In any event, the District Court found that the Duncan Group did intend to sell its shares during the restricted period. *See TheraTx*, Order at 4.

the sale price would have been absent the restrictions, and (2) at what point the Court should measure the value of the shares after the restrictions are lifted.[8]

### Estimating the Hypothetical Sale Price Using the "Highest Intermediate Price"

■ The parties agree that one may obtain an appropriate estimate of the hypothetical sale price by identifying a reasonable period after the restriction was imposed during which the stockholders could have sold the shares and then selecting the "highest intermediate price" during that period as the presumed sale price.[9] Although it provides only a rough approximation of what the stockholders would have received absent the restrictions, this method has the advantage of permitting the stockholders to recover some of the increases in the share price during the restricted period without assuming that the stockholders would have sold at the highest possible share price during the period.[10]

The intuition behind this rule is that the issuer-defendant should bear the risk of uncertainty in the share price because the "defendant's acts prevent a court from determining with any degree of certainty what the plaintiff would have done with his securities had they been freely alienable."[11] But the issuer should not bear the risk of all subsequent share price increases because it is impossible to know whether and when the stockholders actually would have sold their shares during the restrict-

---

**8.** These questions are difficult because, once litigation begins, the parties will be likely to "cherry-pick" the most advantageous date for their position. For example, it is in the interest of the stockholders to propose the date during the restricted period on which the share price was highest to maximize damages, just as it is in the interest of the issuer to propose the date on which the share price was lowest to minimize damages.

**9.** This rule is adapted from the rule used to determine damages in conversion cases because, by preventing the stockholders from trading their shares, the issuer's breach at least in some sense is a temporary "conversion" of the shares. *See Madison Fund, Inc. v. Charter Co.*, S.D.N.Y., 427 F.Supp. 597, 609–10 (1977); *Am. Gen. Corp.*, 622 A.2d at 9–11 (applying the highest intermediate value test and observing that "the highest intermediate value formula . . . is the most commonly employed measure of damages in conversion cases"). The "reasonable time" in this context is the "time in which [the plaintiff] could have disposed of its shares without depressing the market had it been able to do so." *Madison Fund*, 427 F.Supp. at 609. In the present case, the District Court concluded that the Duncan Group could have sold its shares between January 13, 1995 (the suspension date) and January 23, 1995 at a price of $19.75 per share. *See TheraTx*, Order at 3.

**10.** *See Am. Gen. Corp.*, 622 A.2d at 13 ("[T]he [sale] date should be established by resort to a 'constructive replacement' purchase by the plaintiff, i.e., how long it would have taken the plaintiff to replace the securities on the open market."); *Madison Fund*, 427 F.Supp. at 609 (noting that where the restrictions on sale apply to a commodity with a fluctuating value, the court should apply " 'a compromise attempt to value the chance that the plaintiff might at some time have profited by a rise in value' ") (quoting McCormick, Damages § 48, at 188 (1971)); *Wyndham, Inc. v. Wilmington Trust Co.*, Del.Super., 59 A.2d 456, 459–60 (1948) ("[T]he measure of damages for the loss (as capital) of converted shares of stock of fluctuating value is the highest value from the time of conversion up to a reasonable time after the owner acquires knowledge of the conversion,"); *see also* David Simon & Gerald A. Novack, *Limiting The Buyer's Market Damages To Lost Profits: A Challenge To The Enforceability of Market Contracts*, 92 Harv. L.Rev. 1395, 1425–26 (1979) (observing that the decision in *Madison Fund* represented a compromise that "gave the plaintiff the benefit of part, but not all, of the market rise which took place after" the defendant's breach).

**11.** *Am. Gen. Corp.*, 622 A.2d at 10.

ed period.[12] We find that this method of calculating damages provides a satisfactory estimate of the sale price that the Duncan Group would have obtained absent the breach by TheraTx and, thus, the value of the opportunity lost by the Duncan Group as a result of the restriction.

### Calculating Net Damages

The remaining question—and the focus of the dispute on certification—is the method of determining the amount by which the hypothetical "highest intermediate sale price" must be reduced to reflect the remaining value of the shares after the breach. As noted above, this calculation is designed to determine the value of the trading opportunities (i.e., capital gains) lost during the restricted period, while ensuring that the stockholders do not receive a double recovery—that is, damages based on the estimated sale price in addition to the value of the shares that they have since sold or continue to hold.[13] As we see it, there are three potential alternatives for determining the amount to be deducted from the highest intermediate price defined above: (1) the average price of the shares immediately after reinstatement, or

the "hypothetical immediate sale price," (2) the actual sale price obtained by each stockholder, or (3) the greater of the hypothetical immediate sale price and the actual sale price. We conclude that the first alternative provides the measure of damages that minimizes *ex ante* the joint costs of the breach.

### (1) Hypothetical Immediate Sale Price

■ The Duncan Group argues that the decision in *Madison Fund* established the appropriate method of determining damages in cases like this one. To calculate the amount to be deducted from the highest intermediate price, the *Madison Fund* Court first identified a reasonable period after the restriction was lifted during which the stockholder could have sold the shares [14] and then determined the average share price during that period.[15] This calculation is intended to establish how much the stockholders "could have realized from the sale of [their] shares within a reasonable time after they were registered." [16] The *Madison Fund* Court's theory supposes that stockholders who elect not to sell their shares (a) fix the amount of damages

---

**12.** *Madison Fund*, 427 F.Supp. at 608 ("This Court simply cannot credit plaintiff with market prescience. And, as the Supreme Court has observed, 'even where the defendant by his own wrong has prevented a more precise computation, the (factfinder) may not render a verdict (with respect to damages) based on speculation or guess-work.' ") (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946)).

**13.** *See Madison Fund*, 427 F.Supp. at 610 & n. 3 (explaining the rationale for deducting value of the shares after the shelf registration is reinstated).

**14.** This reasonable time period, as before, is based on the time that would have been required to dispose of the block of shares without disturbing the market price. *See Madison Fund*, 427 F.Supp. at 610. Alternatively, one may think of this period as the time required for the stockholders to determine whether

they wish to sell their shares immediately after the restrictions are lifted or to retain them for speculative purposes.

**15.** The average price calculation was designed as a compromise that reflects the approximate value of the shares at the time the restriction was lifted. *See Madison Fund*, 427 F.Supp. at 610 n. 3. If the court had used the highest price during the period (as in the initial highest intermediate price calculation), the plaintiffs would effectively bear the risk of a price increase that could wipe out their recovery; if the court had used the lowest price during the period, the defendants would effectively bear the risk of a price decrease that could dramatically increase the plaintiffs' recovery.

**16.** *Madison Fund*, 427 F.Supp. at 610.

by (constructively) selling their shares soon after the restrictions are lifted and (b) (constructively) repurchase the shares as an independent, speculative investment.[17] This rule assigns the risk associated with uncertainty in the share price after the restricted period solely to the stockholders who decide to retain their shares.[18]

TheraTx contends that the *Madison Fund* rule applies only in the context of a declining market, maintaining that:

> The only reason the court in *Madison Fund* used a constructed sales price following reinstatement of the shelf registration was for mitigation purposes to prevent recovery of excessive damages because the plaintiffs allowed the value of their shares to go down in a steadily declining market when they reasonably could have acted to avoid unnecessary harm.

This characterization of the rationale in *Madison Fund* is flawed. First, the loss in value attributable to the breach is determined by subtracting the value of the shares after reinstatement from the hypothetical sale price. As a consequence, the stockholders are not overcompensated if they retain their shares and the share price happens to rise thereafter. Second, the *Madison Fund* Court applied the hypothetical immediate sale price because "the Court will not take into account [the plaintiff's] delay in the sale of its shares for speculative purposes."[19]

The *Madison Fund* Court thus indicated that stockholders may not speculate by retaining their shares after reinstatement while expecting to be compensated (in the form of increased damages) for a fall in the share price.[20] But this logic runs in both directions: The issuer-defendant may not expect the stockholders to absorb the cost

---

**17.** *See id.* This constructive immediate sale theory is similar to the "new investment" rule developed in securities fraud cases. Under the "new investment" rule, a defrauded stockholder may elect to retain the shares purchased as a result of the fraud, but the courts view this election as an independent investment decision that does not affect the defendant's liability for the fraud. *See Nye v. Blyth Eastman Dillon & Co., Inc.*, 8th Cir., 588 F.2d 1189, 1198 (1978) ("Any increase or decrease in the value of the stock after a reasonable time is causally unrelated to the initial decision to purchase and can serve to neither decrease nor increase the amount of damages."); *see also* Andrew L. Merritt, *A Consistent Model of Loss Causation In Securities Fraud Litigation: Suiting The Remedy To The Wrong*, 66 Tex. L.Rev. 469, 476 & n. 25 (1988) ("After this date [when the fraud became known], courts may deem the plaintiff to have made a new investment decision whether to hold or sell the security. Once alerted to the fraud, the plaintiff bears the risk of subsequent market losses.") (collecting cases).

**18.** *Cf. Harris v. American Inv. Co.*, 8th Cir., 523 F.2d 220, 227 (1975) ("At common law, a defrauded purchaser of securities is under no duty to sell them prior to maintaining an action for deceit [for mitigation of damages or any other purpose] but may hold them for investment purposes if he chooses.") (citations omitted), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976). Although the theory of the breach in this case is premised on the stockholders' lost opportunity to trade the shares during the restricted period, there is no reason to require the stockholders actually to sell their stock after the restrictions are lifted in order to fix the amount of damages. As noted earlier, the stockholders are compensated for the loss of a range of options and not for the loss of an actual sale of the shares.

**19.** *Madison Fund*, 427 F.Supp. at 610.

**20.** The court mentioned the term "mitigation" only to explain why it employed the average price during the period after reinstatement instead of the "highest intermediate" price used to calculate gross damages. *See Madison Fund*, 427 F.Supp. at 610 n. 3 ("This Court concludes that the 'average price' standard is appropriate in this context, essentially involving damages mitigation. The 'highest price' standard applied earlier, by contrast, is designed to allow plaintiff some recoupment of lost opportunity.").

of a fall in the share price if the stockholders do not receive the full benefit of an increase in the share price.[21]

Third, TheraTx contends that, under *Madison Fund*, it should nevertheless receive a credit for the subsequent appreciation in the share price because the appreciation represents a "reasonable step" to mitigate the damages caused by the breach. But it is odd to characterize the retention or sale of securities as a reasonable step to mitigate damages because the value of the shares is volatile and the future performance of the shares is inherently unknowable. The suggestion that stockholders "reasonably could have acted to avoid unnecessary harm" by selling or retaining the shares assumes that the stockholders know that the share price is set to decline or rise at the time they make their decision.

Although it is simple enough to identify, with hindsight, a steadily rising or a steadily declining market, it is unrealistic to suppose (and *Madison Fund* does not appear to contemplate) that stockholders can accurately forecast whether the present trend in the share price will continue or whether the trend will be reversed, and then act accordingly to mitigate damages.

If stockholders decide to retain their shares, they are simply betting that the future price of the shares will increase; the stockholders could not know at the time whether the retention would actually reduce damages. The theory underlying TheraTx's argument would seemingly permit the stockholders to "mitigate" damages by selling their shares immediately and then taking the proceeds to the roulette wheel—or, equivalently, purchasing other shares.

As the *Madison Fund* Court implied, the proper damages rule in this context is necessarily different from the traditional requirement that the nonbreaching party secure substitute transactions in order to mitigate contract damages.[22] Securities are different from traditional goods subject to the "cover" rule in that securities' prices generally follow a "random walk" and can fluctuate substantially over short periods. It therefore makes little sense to consider the stockholders' speculative retention of shares after the restrictions are lifted as a form of substitute transaction that mitigates the damages caused by the restriction on the shelf registration.[23] We conclude that, when viewed from the time of the agreement, most contracting parties

---

**21.** The District Court acknowledged this argument but held that following *Madison Fund* in this case would place the Duncan Group in a better position than if the contract had been performed. *See TheraTx*, Order at 5. As noted earlier, however, the measure of the value of the plaintiffs' lost opportunities is best estimated using the prevailing share price at the time of the reinstatement. Later share price changes are irrelevant to these calculations.

**22.** *See Madison Fund*, 427 F.Supp. at 608 (rejecting the standard measure of damages for late delivery of goods because "the formula is addressed to goods other than securities, i.e., whose values normally reflect general upward or downward trends, without the type of short-term vacillation to which securities are heir"): *see also* Restatement of Contracts § 350 cmt. c (describing situations in which

substitute transactions are appropriate to mitigate damages).

**23.** *See Am. Gen. Corp.*, 622 A.2d at 11 ("While there is a general duty to mitigate damages if it is feasible to do so, a plaintiff need not take unreasonably speculative steps to meet that duty.") (citations omitted). Indeed, Section 350(a) of the Restatement provides that "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." *See also Brzoska v. Olson*, Del.Supr., 668 A.2d 1355, 1367 (1995) ("A party has a general duty to mitigate damages if it is feasible to do so.") (citations omitted). This provision seems to require mitigation efforts that do not involve high levels of risk—unlike investments in equity markets.

would prefer the immediate hypothetical sale rule over the options discussed below because it assigns the risk of post-reinstatement share price changes to stockholders who elect to retain the shares.

### (2) Actual Sale Price

The desirability of the hypothetical immediate sale approach is best illustrated by comparing it with the alternatives. Consider first a rule under which the court deducts the actual sale price that the stockholders received for their shares—or, in the absence of a sale, the price of the shares at the time of trial—from the hypothetical "highest intermediate price."[24] Under this rule, if a stockholder retains its shares, the amount of damages depends in part on the performance of the shares after the restriction is lifted.

When viewed from the time of the merger agreement, this rule is suboptimal because it effectively grants the stockholders' a riskless or "one-way" option in the shares. For example, consider the operation of the actual sale price rule in two hypothetical scenarios. First, suppose that the share price falls between the time at which the restrictions are lifted and the time at which the stockholders sell their shares (or the time of the trial). In this situation, the damage award increases to compensate the stockholders for their increased losses. Next, suppose that the share price rises after the restrictions are lifted. In this scenario, the amount of damages decreases as the share price rises—but only until the damages are completely offset.[25] The stockholders would benefit from any further increases in the share price beyond that point. The stockholders would be insulated from any fall in the share price while benefiting from any increase in the share price above the "highest intermediate price."

Under the actual sale price rule, therefore, the issuer-defendant is not compensated fully for bearing the entire risk of a fall in the share price after reinstatement because the issuer participates only in a part of the potential gains from an increase in the share price (in the form of a reduction damages until damages are completely offset). Because neither party could know *ex ante* whether the share price would rise or fall and neither party can directly influence the share price, there is no reason to think that the issuer is in a better position to bear this additional risk.[26] The actual sale price rule would

---

24. This appears to be the rule followed in *Lawrence Fund, L.L.P. v. Helionetics, Inc.*, S.D.N.Y., 1996 WL 352911 at *6 (1996). Since the plaintiffs in that case still held the shares in question at the time of the trial, the court found "that a deduction for the current value of the shares is appropriate." *Id.; see also Riskin v. National Computer Analysts, Inc.*, N.Y.Supr., 62 Misc.2d 605, 308 N.Y.S.2d 985, 989 (1970) ("The measure of damages is the difference between the market price at such time or within such reasonable time thereafter as the sale might have been consummated and the market price at the time of trial."), *modified*, N.Y., 37 A.D.2d 952, 326 N.Y.S.2d 419 (1971).

25. The damages would be completely offset where the actual sale price equals the "highest intermediate price" used to determine gross damages. Of course, the parties could

not know at the time of the agreement whether the share price would increase (thus reducing damages) or decrease (thus increasing damages).

26. *See* Goetz & Scott, *supra* note 4, at 971–72 ("[T]he contractual obligee and obligor would agree in advance to minimize the joint costs of adjusting to prospective contingencies, assigning the responsibility of mitigating to whoever is better able to adjust to the changed conditions."); *see also* Posner, *supra* note 4, at 82–85 (observing that default rules should reflect *ex ante* assessment of which party would be the least-cost bearer of risk). Put differently, there is no least-cost bearer of the risk of changes in share price after reinstatement because the probability of a rise or fall in the market price for the shares—and, *thus, the expected value of the shares at the*

thus result in net transfer from the issuer to the affected stockholders.[27] Since the parties would be unlikely to bargain for such an uncompensated transfer, we conclude that the actual sale price rule is not an appropriate default method of calculating damages.

### (3) Maximum Reduction in Damages

TheraTx does not endorse a rule under which the court adjusts the amount of damages to reflect the actual sale price of the securities, whether up or down. Instead, TheraTx argues that it should receive the benefit of increases in the share price after the restrictions are lifted without disturbing the *Madison Fund* rule that the defendant should not be required to pay higher damages if the stock price falls.[28] This rule would permit courts to consider the actual sale price of the shares in calculating damages only if doing so would reduce the amount of damages.

Although it is obvious why TheraTx advocates this rule, the rule makes little sense. The TheraTx rule puts the risk of a fall in the share price after the restrictions are lifted on the stockholders while

crediting the issuer with any increases in the share price until damages are completely offset—a "heads I win, tails you lose" proposition for the issuer. As before, when viewed from the time of the merger agreement, neither party could know whether the share price would increase or decrease after reinstatement of the shelf registration. The stockholders in this situation are not fully compensated for bearing the downside risk because the stockholders participate only in part of the upside gains. This problem is the opposite of that identified under the "actual sale price" rule: The rule proposed by TheraTx constitutes an uncompensated transfer from the stockholders to the issuer.[29] As a result, we conclude that the rule is not an appropriate default method of calculating damages in cases like this one.

TheraTx also seems to make a broader argument that courts should tailor damage mitigation rules according to the circumstances of each case.[30] This *ad hoc* approach is undesirable because (a) it allocates risks based on what actually happened rather than based on how the parties would have allocated risks *ex ante*

---

time of reinstatement—does not depend in any way on which party bears which risks.

**27.** *Cf.* Goetz & Scott, *supra* note 4, at 994 (arguing that a rule permitting a promisee "either to seek damages at the time of [an anticipatory] repudiation or to wait until time for performance and recover damages based upon the market differential at that later date" is suboptimal because the nonbreaching party always has an incentive "to wait until the time for performance in order to speculate at [the breaching party's] expense"). In contrast, stockholders under the *Madison Fund* rule bear both the upside and downside risks after the hypothetical immediate sale because the court would treat the retention of the stock as a new investment.

**28.** This is the rule that the District Court applied to the present case. *See TheraTx,* Order at 5.

**29.** *Cf.* Goetz & Scott, *supra* note 4, at 974–75 ("[A]lthough the doctrine of avoidable consequences requires a mitigator to minimize the joint costs of breach, it does not require minimizing the defendant's loss in a way that imposes a still greater loss on the mitigator himself."). As a practical matter, the rule advocated by TheraTx would force plaintiffs to sell their shares immediately because they would have nothing to gain from retaining the shares.

**30.** TheraTx thus contends that the court in *Madison Fund* created an *ad hoc* remedy tailored to the specific situation in that case. We disagree. As noted in the discussion of the *Madison Fund* holding, the *Madison Fund* Court fashioned an appropriate default damage rule for cases like the present case and did not merely adapt existing rules to the peculiarities of the case before it.

and (b) it leaves in flux the measure of damages until litigation is complete. In the absence of a clear, predictable damages rule defined in advance, the parties have nothing to guide their behavior: The breaching party cannot assess the cost of the breach and the nonbreaching party cannot assess the effect of its actions on the amount of damages. This sort of *ex post* damage determination also permits each party to act strategically after a breach to manipulate the amount of damages in its favor.

### Conclusion

We conclude that, under Delaware law, the appropriate measure of the damages caused by an issuer's temporary suspension of a shelf registration in violation of the terms of a merger agreement is the difference between the highest price of the shares during a reasonable time after the registration is suspended and the average price of the shares during a reasonable period after the registration is reinstated. This is a sensible "bright line" rule that is fair and achieves more certainty than the alternatives. Thus, it appropriately accommodates the reasonable expectations of the contracting parties *ex ante*, which are centered upon maximum freedom of choice for the stockholders.

By treating a stockholder's choice to retain the shares after reinstatement as a new investment decision, this rule (1) provides certainty by immediately locking in the amount of damages after the breach and (2) assigns the risk of all fluctuations in the share price after reinstatement to stockholders who elect to retain the shares. We therefore reject the argument that a stockholder's decision to retain the shares after reinstatement constitutes a reasonable step to mitigate the damages caused by the breach.

Accordingly, we answer the certified question as follows: Under Delaware law,

contract damages caused by the temporary suspension of a shelf registration in violation of the terms of a contract are measured by calculating the difference between (1) the highest intermediate price of the shares during a reasonable time at the beginning of the restricted period and (2) the average market price of the shares during a reasonable period after the restrictions were lifted.