# IN THE
## COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| **JACK MAYHORN and**<br>**GEORGIA MAYHORN,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **C.A. No. CPU4-16-000219** |
| | ) | |
| **SININA TALLEY-SIDERS,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION & ORDER

Submitted: August 2, 2017
Decided: September 5, 2017

Donald L. Gouge, Jr., Esq.
800 N. King Street, Ste. 303
Wilmington, DE 19801
*Attorney for Plaintiffs*

Sinina Talley-Siders
P.O. Box 1402
Bear, DE 19701
*Pro se Defendant*

**WELCH, J.**

This case concerns the breach of an Agreement of Sale for real estate. Both parties appeared for trial before the Court on August 2, 2017. The Court reserved its decision. This is the Court's Final Memorandum Opinion and Order after consideration of the pleadings, oral and documentary evidence submitted at trial, arguments made at trial, and the applicable law.

## FACTS

Despite not personally touring 2741 Old Country Road, Newark, DE 19702 ("the Property") until the day of settlement on July 9, 2015, Defendant Sinina Talley-Siders ("Defendant") signed the Agreement of Sale for the Property on May 10, 2015.[1] A Seller's Disclosure of Real Property Condition Report with an attached addendum was also signed by both parties on April 23, 2015, indicating that Plaintiffs were disclosing known material defects in the Property.[2] According to the agreement, settlement was scheduled for July 9, 2015.[3] On May 7, 2015, Defendant made a non-refundable deposit of $2,500.00 towards the purchase of the Property.[4]

On May 22, 2015, Defendant's real estate broker, Stefanie Morris, informed Plaintiffs that the home inspection report indicated five items which required their attention: "(1) Lower safety sensor eyes on garage door to proper height[,] (2) Install one (1) handrail to basement walkout stairwell[,] (3) Clean wood stove firebox and flue[,] (4) Replace the two existing smoke detectors with new units in or near existing locations[, and] (5) Replace bathtub wall covering surround in main hall bath."[5] Plaintiffs agreed to make the repairs, and both parties signed the addendum on

---

[1] Joint Exhibit 2, Tab 1.
[2] Joint Exhibit 2, Tab 2.
[3] *Id.*
[4] *Id.*; Joint Exhibit 2, Tab 3 (Defendant's deposit check).
[5] Joint Exhibit 2, Tab 4.

May 23, 2015.[6] Plaintiffs made the repairs and neither Defendant nor her real estate broker complained to Plaintiff about the repairs.[7]

The sale of the Property routinely progressed. On June 9, 2015, an appraisal was performed which deemed the Property to be worth $260,000.[8] Importantly, included in the appraisal is a June 12, 2015 MLS listing, MLS #6560750, that was prepared by Thomas Amatuzio of Amatuzio Appraisal Services, which notes "PartBathMnBe" and "convenient ½ bathroom" in the garage.[9] However, this listing does not distinguish between bathroom types in the beginning of the document, but instead states, "Beds, Baths 3 3/0" and "Bath Full: 3M 0U 0L Bath Part: 0M 0U 0L."[10] Interestingly, the following page contains a diagram of the first floor that indicates "Full bath" and "1/2bath" in separate portions of the plan.[11]

On July 9, 2015, the day of settlement, Defendant, her family, and her real estate broker Ms. Morris inspected the Property while Plaintiffs were waiting at an attorney's office in Hockessin, Delaware to conduct settlement negotiations.[12] Campbell called Ms. Morris to inquire why neither her nor Defendant was present for settlement negotiations. Ms. Morris informed Campbell that Defendant was concerned about water that had accumulated at the bottom of the sump-pump in the Property's basement. Campbell decided to drive to the Property to address Defendant's concerns since he found his explanations failed to quell her worry. He then went

---

[6] Id.

[7] See Joint Exhibit 8, which indicate the total materials and labor cost to Plaintiffs for making the necessary repairs to the Property total $850.00.

[8] Joint Exhibit 2, Tab 7.

[9] Id. at 14. Defendant's confusion at trial stems from this listing which was prepared by Thomas Amatuzio of Amatuzio Appraisal Services and contains the MLS number #6560750. This number is identical to the MLS number that was attached to the updated November 2, 2014 MLS listing that used information which Re/Max Associates uploaded to the MLS corporation. Despite Defendant's attempts to establish a correlation, there is no evidence to suggest that Plaintiffs or Re/Max were involved in the discrepancies of Amatuzio's version.

[10] Id.

[11] Id. at 15.

[12] See Joint Exhibit 2, Tab 9 (the pre-drafted settlement agreement between Plaintiffs and Defendant).

through the exterior and interior of the Property with Defendant, her family, and Ms. Morris. Campbell explained that based on his experience, the sump pump crock was intended to retain water, and showed Defendant the discharge line. After believing he had resolved Defendant's concerns, Campbell drove back to the settlement table in Hockessin. However, Defendant, her family, and Ms. Morris never appeared.

The following day, on July 10, 2015, Campbell and Plaintiffs arrived at the Hockessin office again hoping to conduct settlement. Plaintiffs and Campbell waited at the Hockessin office until approximately five o'clock. Amidst a barrage of unanswered phone calls, Campbell eventually reached Ms. Morris who informed him that Defendant decided not to purchase the Property because of her concern with the sump pump.[13]

By July 14, 2015, Campbell had relisted the Property for $244,000.[14] On October 14, 2015, Plaintiffs entered into a second Agreement of Sale with new buyers.[15] The Property ultimately sold for $244,000, three-thousand less than the agreed upon price between Plaintiffs and Defendant.[16] In order to sell the Property expediently, Plaintiffs credited three percent of the sale price—$7,320.00—to the new buyers for closing costs at settlement.[17] Plaintiffs had scheduled their own settlement negotiations for a new home at five o'clock on July 9, 2015; however, when Defendant failed to settle, Plaintiffs' negotiations were postponed in order to give Plaintiffs additional time to sell the Property. In the first week of August 2015, Plaintiffs eventually settled on their new home; however, they were required to take out a larger mortgage as they did not have any proceeds from the sale of the Property. In addition, because they expected Defendant to buy

---

[13] Joint Exhibit 2, Tab 17 (written indication by Morris that Defendant decided not to buy the Property because of the sump pump).
[14] Joint Exhibit 2, Tab 13.
[15] *Id.*
[16] *Id.* at 1.
[17] *Id.* at 8; Joint Exhibit 2, Tab 14 (noting lower sale price and seller credit for settlement aid).

4

the Property, Plaintiffs had already moved out of their home and, thus, incurred expenses to transport their belongings back into the Property. Plaintiffs did not move into their new home until November 2015. They then continued to live in the Property and their new home because Plaintiffs did not "feel comfortable" leaving the Property vacant. Naturally, Plaintiffs incurred additional costs in having to care for two properties.

## STANDARD OF REVIEW

In civil actions, the burden of proof is by a preponderance of the evidence.[18] "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."[19]

As trier of fact, the Court is the sole judge of the credibility of each fact witness and any other documents submitted to the Court for consideration. If the Court finds that the evidence presented at trial contains conflicts, it is the Court's duty to reconcile these conflicts—if reasonably possible—in order to find congruity. If the Court is unable to harmonize the conflicting testimony, then the Court must determine which portions of the testimony deserve more weight in its final judgment. In ruling, the Court may consider the witnesses' demeanor, the fairness and descriptiveness of their testimony, their ability to personally witness or know the facts about which they testify, and any biases or interests they may have concerning the nature of the case.

## ANALYSIS

Neither party disputes that the amended Agreement of Sale constitutes a valid contract.[20] Plaintiffs allege that Defendant's actions breached the contract which resulted in expectation and

---

[18] *See Gregory v. Frazer*, 2010 WL 4262030, at *1 (Del. Com. Pl. Oct. 8, 2010).
[19] *See Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967).
[20] Delaware law defines a contract "as an agreement upon sufficient consideration to do or not to do a particular thing." *Howlett v. Zawora*, 2012 WL 1205103, at *2 (Del. Com. Pl. Mar. 30, 2012) (citing *Rash v. Equitable Trust Co.,* 159 A. 839, 840 (Del. Super. 1931)).

5

aggravation and inconvenience damages.[21]  At trial, Defendant alleged that Plaintiffs intentionally

misled her when they listed the property with three full bathrooms.[22]

To prevail on a claim for breach of contract, the plaintiff must establish by a preponderance

of the evidence that: (1) a contract existed between the parties; (2) the defendant breached his

obligation imposed by the contract, and (3) plaintiff suffered damages as a result of the defendant's

breach.[23]  The elements of common law fraud are as follows:

> (1) a false representation of material fact; (2) the defendant's knowledge of or belief
> as to the falsity of the representation or the defendant's reckless indifference to the
> truth of the representation; (3) the defendant's intent to induce the plaintiff to act or
> refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance
> upon the representation; and (5) damages to the plaintiff as a result of such
> reliance.[24]

While there is no bright line test to determine what is considered fraud, the Court shall examine

the circumstances surrounding the defendant's action or inaction.[25]  Unless Defendant can prove

that Plaintiffs intentionally misled her into purchasing the Property, it is clear to the Court that

---

[21] Plaintiffs rely on *Ruddy v. Moore* for the proposition that inconvenience and aggravation damages are applicable here. *Ruddy* is not applicable to the facts of this case. First, the inconvenience and aggravation damages were based on a serious leak in the plaintiff's roof that the carpenter admitted was his fault and the installation of the incorrect heating ventilation and air conditioning ("HVAC") system. Both caused considered problems for the plaintiff's use and enjoyment of her home. 1997 WL 717790, at *3-6 (Del. Super. Oct. 21, 1997). The present case does not involve defective installation or repairs. Second, *Ruddy* relies on *Calbert v. Volkswagon of America, Inc.*, which involves the defendants' motion for judgment notwithstanding the verdict, including a jury verdict of five-thousand dollars for aggravation and inconvenience damages. 1991 WL 215669, at *1, 3 (Del. Super. Oct. 1, 1991). *Calbert* involves no analysis, as it concerns the review of a jury award, and its facts surround the Uniform Commercial Code and the purchase of a defective vehicle. *See Id.* at *9 & n.12. The Court is hesitant to extend this category of damages without more analogous precedent.

[22] Originally, Defendant informed her real estate broker that Defendant had decided not to purchase the Property because of perceived problems she believed existed with the sump pump. Joint Exhibit 2, Tab 15. Indeed, despite settlement negotiations spanning two days, she did not articulate any other issues to her real estate broker or Plaintiffs' real estate agent, or Plaintiffs themselves prior to settlement or at settlement. However, in her Answer, Defendant asserts claims of fraud, misrepresentation, and bad faith.

[23] *See VLIW Technology, LLC v. Hewlett-Packard, Co.,* 840 A.2d 606, 612 (Del. 2003).

[24] *CHS Theaters, LLC v. Nederlander of San Francisco Assocs.,* 2015 WL 1839684, at *21 (Del. Ch. Apr. 21, 2015).

[25] *Vituli v. Carrols Corp.,* 2015 WL 5157215, at *6 (Del. Super. May 1, 2015). Common law fraud includes "lies of omission." *See Bromwich v. Hanby,* 2010 WL 8250796, at *5 (Del. Super. July 1, 2010).

6

Defendant was the first party to materially breach the contract.[26] There is sufficient testimony that Defendant decided not to move forward with settlement because of the sump pump. Even assuming Defendant decided not to purchase the Property because she was misled, Defendant must still prove that Plaintiffs misled her.[27]

Plaintiffs' first witness at trial was Justin Campbell, a Delaware and Pennsylvania licensed Re/Max Associates real estate agent and realtor who has been involved in approximately one hundred real estate sales in Delaware. He met Plaintiffs when they approached him inquiring about purchasing a less high maintenance property in a fifty-five and over community. Campbell proceeded to meet with Plaintiffs at the Property to further assess, in detail, the value of the Property by walking through Plaintiffs' home, and describing the process of selling a home.

Importantly, Campbell testified that Re/Max Associates has no working relationship with Zillow.com. Campbell explained that Re/Max Associates upload property information to a Multi-listing Service ("MLS"), which is owned by a third-party corporation, who then sells the information to websites such as Zillow.com. Campbell admitted that Re/Max is responsible for the property information it sells to these MLS companies; however, Re/Max has no input over the information that these MLS companies decide to sell to websites such as Zillow.com.

In regards to the Property at issue in this case, the March 5, 2015 listing MLS #6480529, which Re/Max Associates uploaded to a MLS, denotes that there is one full bathroom and two half-baths.[28] The first listing stated, "Beds, Baths 3 1/2," which Campbell testified indicated three

---

[26] In order for the injured party's remaining obligations under the contract to cease, the breach must be "material." *Preferred Fin. Servs., Inc. v. Business Builders for Entrepreneurs, LLC*, 2016 WL 4537759, at *3 (Del. Com. Pl. Aug. 30, 2016) (internal citations omitted). The breach will be deemed material if it concerns the "'root' or 'essence' of the agreement between the parties, or [is] 'one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'" *2009 Caiola Family Trust v. PWA, LLC*, 2015 WL 6007596, at *18 (Del. Ch. Oct. 14, 2015) (internal citations omitted).

[27] *See Dyer v. Dyer*, 1982 WL 116998, at *1 (Del. Ch. Mar. 1, 1982).

[28] Joint Exhibit 2, Tab 6.

bathrooms total with two of the bathrooms being part-baths.[29] The information also stated "Bath Full: 1M 0U 0L Bath Part: 1M 0U 0L," which Campbell testified indicated a full-bath and part-bath on the main floor levels of the Property.[30] Moreover, the "Features" description of the house stated "PartBathMnBe," informing the reader of a part-bath in the main bedroom.[31] Ultimately, the March 5, 2015 listing was withdrawn for updates. Yet, the updated November 2, 2014 version, MLS #6560750, which was utilized for settlement with Defendant, was a repetition of the first MLS listing, except it also noted that there was a "convenient ½ bathroom" in the two-car garage under the "Remarks" section.[32]

Despite Re/Max Associates uploading correct information to the MLS, Defendant asserts that Campbell fraudulently misled her. The Court disagrees. First, there is no evidence to support Defendant's claim that Plaintiffs or Re/Max Associations placed, or caused to be placed, misinformation on the website Zillow.com. Second, the Court finds Cambell's statement that 3.0 could simply mean 3 bathrooms in general versus 3 full-baths to be credible. Regardless, Defendant's focus on this minute detail is irrelevant. This is because Defendant is relying on a Re-Max Associates internal listing update, which is formatted and compiled by "Showingtime" software. In fact, the internal MLS #6560750 matches the updated November 2, 2014 MLS listing that Defendant relied on for settlement, and MLS #6560750 correctly indicates that there is only one full-bath.

In short, there is simply no evidence in the record that: (1) Plaintiffs or Re-Max Associates uploaded incorrect information to a MLS corporation, (2) Defendant actually read the information generalized in the Re/Max Associates internal email, and (3) Defendant actually relied on this

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*

information. These questions are vital because Defendant must show that Plaintiffs had knowledge that the representation was false or, at the very least, they were recklessly indifferent to the truth, and Defendant must show that it was Plaintiffs' intent to induce her to buy the Property. Defendant has proven neither; therefore, she has failed to provide sufficient evidence that Plaintiffs materially breached the contract prior to her breach of the contract.

## DAMAGES

Plaintiffs are seeking $17,726.51 in total "Actual expenses."[33] Defendant asserts that Plaintiffs damage award should be adjusted to account for "payments made for services beneficial to them." Yet these payments, which includes costs such as the down payment, appraisal fee, and insect inspection, do not reduce the loss to Plaintiffs because of Defendant's material breach. In the alternative, Defendant argues that Plaintiffs have failed to mitigate their losses.[34]

The standard remedy for breach of contract is well-established jurisprudence and is "based upon the reasonable expectations of the contracting parties."[35] These expectation damages are an attempt to right the wrongs of the breaching party by placing the parties "in the same position as if the promisor had performed the contract."[36] However, "[d]amages for a breach of contract must be proven with reasonable certainty. Recovery is not available to the extent that the alleged damages are uncertain, contingent, conjectural, or speculative."[37]

"Additionally, the plaintiff may recover any incidental or consequential losses that arose as a result of the breach."[38] According to the Restatement, "[i]ncidental losses include costs

---

[33] Joint Exhibit 2, Tab 12.

[34] *See Welsh v. Worthy*, 2011 WL 13175147, at *7 (Del. Com. Pl. June 15, 2011) (Welch, J.) (duty to mitigate damages after a material breach).

[35] *See Lee-Scott v. Shute*, 2017 WL 1201158, at *7 (Del. Com. Pl. Jan. 30, 2017) (Welch, J.).

[36] *See Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).

[37] *Dill v. Dill*, 2016 WL 4127455, at *1 (Del. Super. Aug. 2, 2016) (footnote omitted).

[38] *Devincentis v. European Performance, Inc.*, 2012 WL 1646347, at *3 (Del. Super. Apr. 17, 2012) (citing RESTATEMENT (SECOND) OF CONTRACTS § 347 (1981); *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 n.6 (Del. 2001))

incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction."[39] Likewise, "[c]onsequential losses include such items as injury to person or property resulting from defective performance."[40] In either case, the losses must be "foreseeable."[41]

Based on the testimony presented at trial and payment records submitted into evidence, the Court finds that Plaintiffs have proven by a preponderance of the evidence that they suffered a loss in value as a direct result of Defendant's breach of **$10,320.00**. Plaintiffs not only received less money for the Property, but were forced to subtract the new buyer's credit from the Property's reduced value in order to solidify the new sale. Defendants mitigated their loss of value by finding another buyer. Defendant breached the contract on July 10, 2015, Plaintiffs re-listed the Property four days later on July 14, 2015, and the new buyer signed the Agreement of Sale on October 14, 2015. As Plaintiffs were in the midst of settling on their own property, a three-month lapse is sufficient to satisfy their duty to mitigate.[42]

Plaintiffs have also proven by a preponderance of the evidence **$1,303.85** in incidental costs. Plaintiffs were required to renew the Property's termite warranty for $155.00, pay $696.60 in electricity and gas bills for usage from July 9, 2015 to November 7, 2015, $195.02 for a partial loss of their "Home Owners Insurance refund," and $257.23 in taxes for the Property as a result of Defendant's breach. Conversely, the Court will not award Plaintiffs the last Delmarva bill for $117.11 since it includes usage when Plaintiffs no longer resided at the Property.[43] The incidental costs of $62.32 for necessities on the night of settlement and $310.00 for yard work following

---

[39] RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. c (1981); *see also Duncan*, 775 A.2d at 1022 n.6 (relying on the Restatement of Contracts).

[40] RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. c (1981).

[41] *R.M. Williams Co., Inc. v. Frabizzio*, 1993 WL 54423, at *12 (Del. Super. Feb. 8, 1993).

[42] Alternatively, the purchase credit could also be deemed an incidental cost.

[43] Based on the Court's calculations, the Delmarva bills total $813.71.

Defendant's breach were not also not included because the figures are speculative in nature and unforeseeable.

Regarding consequential losses, Plaintiffs have proven by a preponderance of the evidence that they were forced to pay the moving company $3,338.00, which is a more expensive weekend rate that resulted from Plaintiffs being unable to move into their new home as scheduled. Plaintiffs were also required to perform the following repairs, resulting from the second Home inspection report, $64.92 to "Replace 2 GFIs [Ground Fault Circuit Interrupters]," $536.40 for "Installation of Deck Railing," $1,288.00 for "Installation of Reverse Osmosis," $337.00 for "Water Pressure Solution," $18.46 for "Faucet replacement in bathroom," and $29.97 for "Replaced Spray Handle in kitchen faucet." Hence, Plaintiffs are entitled to **$5,612.75** for consequential losses, which were proven by a preponderance of the evidence.

## CONCLUSION

For the foregoing reasons, the Court hereby enters judgment and award of **$17,236.60**, plus pre- and post-judgment interest at the legal interest rate according to 6 *Del. C.* § 2301, *et seq.* Plaintiffs' counsel has requested leave to file a petition for attorney's fees as the subject contract allows for the same. Mr. Gouge shall file his petition within fifteen (15) days and Defendant shall have fifteen (15) days to respond. The Court shall thereafter issue a separate opinion.

**IT IS SO ORDERED** this 5th day of September, 2017.

_____
John W. Welch,
Judge

cc:    Ms. Tamu White, Chief Civil Clerk

11