J-A18008-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| PRECISION KIDD ACQUISITION, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH J. PASS, IN HIS CAPACITY | : | No. 1025 WDA 2019 |
| AS REPRESENTATIVE OF THE | : | |
| SHAREHOLDERS AS PROVIDED IN | : | |
| THE AGREEMENT AND PLAN OF | : | |
| MERGER DATED AS OF JANUARY 5, | : | |
| 2015, BY AND AMONG PRECISION | : | |
| KIDD ACQUISITION, LLC, PRECISION | : | |
| KIDD MERGER SUB, INC., | : | |
| PRECISION KIDD STEEL CO., INC., | : | |
| AND JOSEPH J. PASS, SOLELY IN HIS | : | |
| CAPACITY AS REPRESENTATIVE OF | : | |
| THE SHAREHOLDERS AS PROVIDED | : | |
| IN SAID AGREEMENT | : | |

Appeal from the Judgment Entered July 11, 2019
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-16-018687

| | | |
|---|---|---|
| PRECISION KIDD ACQUISITION, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JOSEPH J. PASS, IN HIS CAPACITY | : | |
| AS REPRESENTATIVE OF THE | : | |
| SHAREHOLDERS AS PROVIDED IN | : | No. 1170 WDA 2019 |
| THE AGREEMENT AND PLAN OF | : | |
| MERGER DATED AS OF JANUARY 5, | : | |
| 2015, BY AND AMONG PRECISION | : | |
| KIDD ACQUISITION, LLC, PRECISION | : | |
| KIDD MERGER SUB, INC., | : | |
| PRECISION KIDD STEEL CO. INC., | : | |
| AND JOSEPH J. PASS, SOLELY IN HIS | : | |
| CAPACITY AS REPRESENTATIVE OF | : | |

J-A18008-20

Appeal from the Judgment Entered July 11, 2019
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD 16-018687

BEFORE: BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED OCTOBER 1, 2020**

Appellant, Precision Kidd Acquisition, LLC ("PKA"), appeals and Appellee, Joseph J. Pass, in his capacity as representative of the shareholders as provided in the agreement and plan of merger dated as of January 5, 2015, by and among Precision Kidd Acquisition, LLC, Precision Kidd Merger Sub, Inc., Precision Kidd Steel Co., Inc., and Joseph J. Pass, solely in his capacity as representative of the shareholders as provided in said agreement, cross-appeals from the July 11, 2019 judgment entered in favor of PKA following a non-jury trial.[1] After review, we vacate and remand for further proceedings.

_____

[1] Both parties purport to appeal from the trial court's June 17, 2019 order granting in part and denying in part PKA's post-trial motion. An order denying post-trial motions is interlocutory and generally not appealable. **See Levitt v. Patrick**, 976 A.2d 581, 584 n.2 (Pa. Super. 2009) (stating that appeal properly lies from the entry of judgment, not from an order denying post-trial motions); **Fanning v. Davne**, 795 A.2d 388, 391 (Pa. Super. 2002) ("An appeal from an order denying post-trial motions is interlocutory. An appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of post-verdict motions, not from the order denying post-trial motions.") (citations omitted). However, since judgment was entered on July 11, 2019, we consider the appeal as taken from the entry of judgment. **See Johnston the Florist, Inc. v. TEDCO Const. Corp.**, 657 A.2d 511, 514-

The trial court summarized the factual background of this case as follows:

The Precision Kidd Steel Co.–Snap-On Relationship

Precision Kidd Steel Co., Inc. (hereinafter "the Company") is a Pennsylvania corporation in the business of manufacturing and shaping steel. Snap-On Logistics Company (hereinafter "Snap-On") was the Company's first or second largest customer from 2010 through 2013. During those years, Snap-On accounted for between $2.8 and $2.9 million — or on average, 10.5% — of the Company's annual sales.

The Company's relationship with Snap-On was governed by a non-exclusive Strategic Supplier Letter (hereinafter the "Snap-On Letter"), under which the Company agreed that if Snap-On ordered products from the Company, Snap-On would pay for the products at a price to be agreed upon on an annual basis. However, nothing in the Snap-On Letter required Snap-On to buy anything from the Company. The Snap-On Letter was for a one-year term with annual renewals, and either party could terminate the relationship in the following ways: 120 days before renewal; immediately, if the other party is acquired; or for convenience, at any time for any reason upon 120 days['] notice.

On January 3, 2014, Snap-On sent a letter to the Company's then-president, Dom Lea (hereinafter "Mr. Lea"), stating they would be terminating the Snap-On Letter agreement effective May 31, 2014. Despite this, Snap-On continues to be a customer of the Company through individual purchase orders, and the Company has retained approximately 20% of Snap-On's business.

The Sale of the Company

In late 2013, the Company's majority shareholders decided to sell the Company. The Company engaged LM+Co. Capital, a New York-based investment bank, and its representative, Rick Zytkowicz (collectively "Zytkowicz"), to find buyers. Zytkowicz contacted Plaintiff Precision Kidd Acquisition, LLC (hereinafter "PKA"), who expressed interest in purchasing the Company.

_____

15 (Pa. Super. 1995) (stating that appellate courts may "regard as done that which ought to have been done") (citations omitted). We have amended the caption accordingly.

Defendant Joseph J. Pass (hereinafter "Mr. Pass") is a Pittsburgh-based attorney who acted as a representative of the Company's shareholders in connection with the sale. Mr. Pass is the sole named defendant in this case, because the terms of the Merger Agreement required that, in the event of a breach, the shareholders, by their representative, would indemnify … PKA.

In February 2014, LM+Co. Capital provided … PKA with the Company's "teaser" document, which provided an overview of the business. While the teaser did not name the Company, it specifically stated that the Company had "long-standing and loyal customers," and boasted "100%-[a]nnual customer retention related to material accounts over the past five years." Jiorgio Nicolo Vergani (hereinafter "Mr. Vergani") — the sole member of V&A Capital, of which … PKA is an affiliate — testified that such a "long-standing" customer base was important to him as a potential investor as it is an "indication of the solidity of products and services of the business … and it is also typically a prediction of the future."

After receiving the teaser, … PKA executed a nondisclosure agreement, and LM+Co. Capital provided … PKA with a Confidential Information Memorandum (hereinafter "CIM"), which included more in-depth information about the Company. The CIM emphasized the Company's longstanding and loyal customer base:

> The average customer relationship spans over ten years, with a number of accounts exceeding 25 years. [The Company's] customer relationships continue to grow in size and scope and management does not believe any of these relationships are vulnerable to attrition. [The Company] has not lost a material account in the past few years.

Joint Exhibit 4, at 8 and 24. The CIM included a list of the Company's top customers, with the amount of revenue from each customer for each year from 2010 to 2012. "Customer A" on said list, ranked by total net revenue, was Snap-On. Mr. Vergani testified that the CIM "and this particular customer base and solidity of it was one of the key factors" that encouraged … PKA to proceed with the transaction.

In March 2014, … PKA submitted a formal indication of interest, proposing to eventually purchase either the assets or the equity of the Company for between $10 and $12 million. Thereafter, … PKA was invited to Pittsburgh for an April 9, 2014[] meeting with

the Company's representatives, and a management presentation given by [Mr.] Lea. The April 2014 management presentation also specifically represented that the Company's highest grossing sales were to hand tool manufacturers, and identified Snap-On at the top of a list of representative customers in that industry. Mr. Lea testified that no one from … PKA asked anyone from the Company about whether any customers had cancelled any contracts. However, Mr. Vergani testified that one of the first questions he typically asks at these types of meetings is whether any material customers were going to or had recently cancelled their agreements, and he has no reason to believe he did not ask that question at the April 2014 management presentation.

Shortly after the management presentation, the Company gave … PKA access to its digital data room, which housed its important financial and legal documents. Notably, … PKA had access to documents indicating that the Company suffered significant losses through November 30, 2014 — approximately five weeks before the closing for the sale of the Company. While … PKA reviewed the Snap-On Letter through its access to the data room, … PKA was never made aware of Snap-On's January 3, 2014[] letter terminating the Snap-On Letter agreement, which was[] not made a part of the data room.

On August 1, 2014, … PKA and the Company executed a letter of intent (hereinafter "LOI"), providing a detailed framework for the deal, which was to involve a purchase of the outstanding stock of the company by … PKA in exchange for $11.5 million — a price that was based on the Company's EBITDA,[2] and which was eventually lowered to $11.4 million due to certain outstanding environmental issues. After the execution of the LOI, … PKA again met with Mr. Lea in Pittsburgh on August 12, 2014. The agenda for that meeting, drafted by … PKA and provided to [Mr.] Lea, specifically asked whether there had been "[a]ny loss or gain of significant customers and/or issues with suppliers." [] PKA alleges that neither [Mr.] Lea, nor anyone else from the Company, informed … PKA at the August 2014 meeting that Snap-On had cancelled its Contract or otherwise materially changed its relationship with the Company.

_____

[2] "EBITDA" stands for "earnings before interest, taxes, depreciation, and amortization." *See, e.g.*, PKA's Brief at 11 n.2.

[] PKA alleges that it was precluded from contacting the Company's customers until December 30, 2014 — one week before the transaction was to close. During that week, … PKA did attempt to contact customers it had identified as having a possible reason to discontinue its relationship if the transaction proceeded. However, … PKA did not attempt to contact Snap-On, as, according to Mr. Vergani, the Company had not given … PKA any reason to doubt the stability of that relationship. [] PKA was not able to obtain a response from any of the Company's customers prior to closing, but insisted on, and received, additional assurances in writing from the Company that the Company's relationships with those customers were intact. Notably, [Mr. Pass] argues that the Company offered to extend the closing deadline to give … PKA more time to conduct these interviews, but … PKA declined this offer, and elected to proceed with the closing as planned.

[] PKA insists that prior to closing on January 5, 2015, no one informed … PKA that Snap-On cancel[l]ed or otherwise altered its contractual and business relationship with the Company. Moreover, Mr. Lea and Mr. Pass both testified they had no recollection of ever telling … PKA that Snap-On had cancel[l]ed its contract.

The Merger Agreement and Disclosures

The Merger Agreement (hereinafter the "Agreement"), which memorialized … PKA's acquisition of the Company, was … signed by both parties on January 5, 2015. Article III of the Merger Agreement contained certain representations and warranties of the Company, among which was the following:

Section 3.08 **Absence of Certain Changes, Events and Conditions.** Except as set forth on Section 3.08 of the Disclosure Schedule, since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been, with respect to the Company, any:

(a) event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

…

(n) acceleration, termination, material modification to or cancellation of any Material Contract (including, but not limited to, any Material Contract) to which the Company is a party or by which it is bound[.]

Joint Exhibit 25, at 27-28. "Material Adverse Effect" is defined as:

[A]ny event, occurrence, fact, condition or change that is, or would reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Company, or (b) the ability of the Company to consummate the transactions contemplated hereby on a timely basis; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Company operates; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement, except pursuant to Section 3.03 and Section 5.07; (vi) any changes in applicable Laws or accounting rules, including GAAP; or (vii) the public announcement, pendency or completion of the transactions contemplated by this Agreement.

[*Id.*] at 9.

Section 3.08 of the referenced Disclosure Schedule does not reveal any information relating to Snap-On or its relationship with the Company. [] PKA alleges that the change in relationship with Snap-On constituted a Material Adverse Effect, and that the Snap-On contract was a "Material Contract" under Section 3.08(n) as it was material to the Company's business, even if it was not a "Material Customer" listed in the Merger Agreement's disclosure schedules.

Moreover, Article III of the Merger Agreement also contained the following representation and warranty by the Company:

Section 3.15 **Customers and Suppliers**.

(a) **Section 3.15(a)** of the Disclosure Schedules sets forth (i) each, customer who has paid aggregate consideration to,

- 7 -

the Company for goods or services rendered in an amount greater than or equal to $250,000 for each of the two (2) most recent fiscal years (collectively, the "Material Customers"); and (ii) the amount of consideration paid by each Material Customer during such periods. The Company has not received any written notice or, to the Company's Knowledge an oral indication, that any of its Material Customers has ceased, or intends to cease after the Closing, to use its goods or services or to otherwise terminate or materially reduce its relationship with the Company.

Joint Exhibit 25, at 33. Section 3.15(a) of the referenced Disclosure Schedule lists Snap-On as one of the Company's Material Customers, with 2013 gross sales of $2,819,471.52, and 2014 sales through September 30, 2014 of $1,336,701.54. Section 5.05(a)(i) of the Merger Agreement also required the Company to notify PKA of any "fact, circumstance, event or action" that could either have had a Material Adverse Effect on the Company, or which could have resulted in one of the Company's above representations and warranties not being true and correct.

Finally, Article VIII of the Merger Agreement also addressed PKA's contractual right to rely on the Company's representations and warranties:

Section 8.08 **Effect of Investigation**. The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation or warranty is, was or might be inaccurate or by reason of the Indemnified Party's waiver of any condition set forth in Section 7.02 or Section 7.03, as the case may be.

Joint Exhibit 25, at 61.

The Purchase Price

The Agreement sets forth the following definitions that lead to the final purchase price:

"**Base Merger Consideration**" means $11,400,000.

- 8 -

"**Closing Cash Merger Consideration**" means (i) the Base Merger Consideration, <u>plus</u> (ii) the amount of the Bad Debt Reserve, <u>plus</u> (iii) the amount, if any, by which the Estimated Closing Net Working Capital exceeds the Target Net Working Capital Amount, <u>plus</u> (iv) the amount of Estimated Cash of the Company as of the open of business on the Closing Date, <u>minus</u> (v) the amount, if any, by which the Estimated Closing Net Working Capital is less than the Target Net Working Capital Amount, <u>minus</u> (vi) the Indemnification Escrow Amount, <u>minus</u> (vi) the Adjustment Escrow Amount, <u>minus</u> (viii) the Shareholder Representative Expense Amount, <u>minus</u> (ix) the outstanding Estimated Indebtedness of the Company as of the open of business on the Closing Date, <u>minus</u> (x) the amount of unpaid Estimated Transaction Expenses of the Company as of the open of business on the Closing Date; <u>minus</u> (xi) the Underfunded Pension Liability Amount, and <u>minus</u> (xii) the Subordinated Note Amount.

"**Final Cash Merger Consideration**" means (i) the Base Merger Consideration, <u>plus</u> (ii) the amount of the Bad Debt Reserve, plus (iii) the amount, if any, by which the Closing Net Working Capital as finally determined pursuant to **Section 2.16** exceeds the Target Net Working Capital Amount, <u>plus</u> (iv) the amount of Cash of the Company as of the open of business on the Closing Date as finally determined pursuant to **Section 2.16**, <u>minus</u> (v) the amount, if any, by which the Closing Net Working Capital as finally determined pursuant to **Section 2.16** is less than the Target Net Working Capital Amount, <u>minus</u> (vi) the Indemnification Escrow Amount, <u>minus</u> (vii) the Adjustment Escrow Amount, <u>minus</u> (viii) the Shareholder Representative Expense Amount, <u>minus</u> (ix) the outstanding Indebtedness of the Company as of the open of business on the Closing Date as finally determined pursuant to **Section 2.16**, <u>minus</u> (x) the amount of unpaid Transaction Expenses of the Company as of the open of business on the Closing Date as finally determined pursuant to **Section 2.16**; <u>minus</u> (xi) the Underfunded Pension Liability Amount, and minus (xii) the Subordinated Note Amount.

"**Indemnification Escrow Amount**" means $1,000,000.

Joint Exhibit 25, at 2-3, 7-8.

<u>After the Closing</u>

> After the transaction closed on January 5, 2015, … PKA's Board of Directors held a post-closing meeting on January 29, 2015.  At the post-closing meeting, … PKA learned of the cancellation of the Snap-On Letter for the first time.  [] PKA then filed the instant litigation.

Trial Court Opinion (TCO), 10/2/18, at 2-10 (most internal citations omitted).

With respect to the instant litigation initiated by PKA, the trial court explained that:

> [PKA] filed an action for breach of contract and contractual indemnification regarding the merger of its wholly-owned subsidiary with [the Company].  [Mr. Pass] is the representative of the shareholders of that former [C]ompany.  [PKA] alleged that [the selling shareholders] failed to disclose prior to the merger that Snap-[O]n…, one of the target [C]ompany's largest customers, had in fact terminated its contract in the prior year, arguably making the [C]ompany less profitable and therefore less valuable.  [PKA] sought indemnification for damages pursuant to the terms of the Merger Agreement.
>
> Following a non-jury trial lasting several days, as well as extensive post–trial filings and argument by the parties, this court entered an Opinion and Non–Jury Verdict…[,] dated September 27, 2018, finding a breach of the Merger Agreement and awarding [PKA] $36,000 in damages.  [PKA] timely filed a Motion for Post-Trial Relief pursuant to Pa.R.C.P. 227.1, which was granted in part and denied in part by this [c]ourt on June 17, 2019.  Essentially, this [c]ourt granted the post-trial motion regarding the addition of attorneys' fees to the verdict, awarding $384,309.42 in attorneys' fees.  The balance of the [p]ost–[t]rial [m]otion was denied.

Rule 1925(a) Opinion (RO), 12/30/19, at 1-2.

On July 11, 2019, PKA filed a praecipe for entry of judgment against Mr. Pass in the amount of $420,309.42.  On that same day, PKA filed a timely notice of appeal.  Subsequently, on July 25, 2019, Mr. Pass filed a timely notice of cross appeal.  The trial court instructed each party to file a Pa.R.A.P.

1925(b) concise statement of errors complained of on appeal, and both parties timely complied.

### PKA's Appeal

We address PKA's appeal first. PKA raises the following issues for our review:

> 1. After finding that the selling shareholders breached the parties' merger agreement by failing to disclose the loss of one of the target [C]ompany's key customers prior to closing, did the [t]rial [c]ourt err in failing to award damages in the amount of the difference between the amount the purchaser paid for the company, and the actual value of the [C]ompany without the key customer?
>
> 2. Did the [t]rial [c]ourt err or abuse its discretion in disregarding the purchaser's two proposed damages analyses when (a) the [t]rial [c]ourt's opinion suggested that it did not recall the first analysis, and (b) the [t]rial [c]ourt's alleged reasons for disregarding the second analysis are demonstrably inaccurate?
>
> 3. Did the [t]rial [c]ourt err in holding that the purchaser failed to establish its damages "with reasonable certainty" under applicable law when both the purchaser and the selling shareholders presented multiple, alternate, and detailed damages analyses supported by evidence, detailed financial statements, and expert testimony?
>
> 4. After finding that the selling shareholders breached the parties' merger agreement by failing to disclose the prior loss of one of the target [C]ompany's key customers, which accounted for almost $3,000,000 (or roughly 10.5%) of the [C]ompany's annual sales, did the [t]rial [c]ourt err or abuse its discretion in awarding the purchaser only $36,000 in damages based upon the terms of a contract that had not been breached, and to which neither the selling shareholders nor the purchaser were parties?

PKA's Brief at 5-6.

> Initially, we acknowledge:
>
> When reviewing the verdict from a bench trial, we must review the evidence of record in the light most favorable to the verdict

winner to determine whether competent evidence supports the trial court's findings and whether it erred in reaching its conclusions of law. We afford the same weight to the trial court's findings of fact as we do a jury's verdict. We will only reverse if the trial court's findings of fact are unsupported by competent evidence or if it erred as a matter of law.

***Newman Dev. Grp. of Pottstown, LLC v. Genuardi's Family Mkt., Inc.***, 98 A.3d 645, 652 (Pa. Super. 2014) (*en banc*) (internal citations omitted).[3]

---

[3] Although Delaware substantive law applies to this matter, ***see*** RO at 4-5, "[w]henever Pennsylvania is the chosen forum state for a civil action, our state's procedural rules, *i.e.*, the Pennsylvania Rules of Civil Procedure, govern, no matter what substantive law our courts must apply in resolving the underlying legal issues." ***ADP, Inc. v. Morrow Motors Inc.***, 969 A.2d 1244, 1246 n.2 (Pa. Super. 2009) (determining that, as a result, our summary judgment scope and standard of review applied to the matter before it) (citations omitted); ***see also Murray v. Janssen Pharmaceuticals, Inc.***, 180 A.3d 1235, 1252 (Pa. Super. 2018) ("[P]rocedural law is the set of rules which prescribe the steps by which the parties may have their respective rights and duties judicially enforced, whereas substantive law is the portion of the law which creates the rights and duties of the parties to a judicial proceeding.") (original brackets, quotation marks, and citation omitted); ***see also*** Pa.R.C.P. 1038(a) ("[T]he trial of an action by a judge sitting without a jury shall be conducted as nearly as may be as a trial by jury is conducted and the parties shall have like rights and privileges…."). Further, both parties agree that Pennsylvania's scope and standard of review apply in this case. PKA's Brief at 3-4 (stating that Pennsylvania law governs questions of procedure including standards of review) (citation omitted); Mr. Pass's Brief at 1-3 (setting forth Pennsylvania law in its Counter Statement of Scope and Standard of Review section of his brief). Therefore, we apply our scope and standard of review.

However, as we will be applying Delaware substantive law, we note at the outset that litigants may cite to unreported Delaware decisions. ***See*** Del.Sup.Ct.R. 14(b)(vi)(B)(2) (providing guidance on citing to unreported decisions). "Delaware permits the citation of unpublished decisions of the Delaware courts as precedent." ***Lowinger v. Oberhelman***, 924 F.3d 360, 366 (7th Cir. 2019) (citing ***New Castle Cnty. v. Goodman***, 461 A.2d 1012, 1013 (Del. 1983) ("[L]itigants before this Court may cite Orders as precedent…."), and ***Issa v. Delaware State Univ.***, 268 F. Supp. 3d 624, 631

All of PKA's issues challenge the trial court's award of $36,000 in damages. Therefore, before delving into each issue, we set forth the trial court's rationale for its damages award:

> PKA argues the proper measure of damages in this case is the difference in value between the Company as represented by [the selling shareholders] and the actual value of the Company upon its purchase. [] PKA specifically argues it would have paid less for the Company if [the selling shareholders] disclosed Snap-On's change in contract with the Company. [PKA] claims it suffered $2.1 million in damages as a result of [the selling shareholders'] omission.
>
> Conversely, [Mr. Pass] argues that the proper measure of damages is not the difference between what [PKA] paid and what it received; rather, the proper measure is the difference between the value of the Company at the time of the transaction and what [PKA] paid. [Mr. Pass] further argues [PKA] purchased the Company for less than its fair market value and received the benefit of the bargain despite the omission and loss of business from Snap-On. [Mr. Pass] also submits three alternative lost[-]profits analyses for this [c]ourt's consideration.
>
> A review of the record demonstrates [PKA] is entitled to $36,000.00 in damages. In a breach of contract case, the standard for proving damages is as follow[s]:
>
> > A party seeking damages for breach of contract must be able to prove such damages with reasonable certainty. Damages in a breach of contract action must be proved with reasonable certainty. Otherwise, they are generally not recoverable. The question of whether damages are speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages.

_____

n.1 (D. Del. 2017) (noting that **Goodman** remains good law despite a change in the Delaware Supreme Court's rule allowing citations to non-precedential decisions)).

- 13 -

***Printed Image of York, Inc. v. Mifflin Press, Ltd.***, 133 A.3d
55, 59-60 (Pa. Super. 2016) (citations and quotations omitted).[4]

At trial, [PKA's] expert witness, Christopher Gregory, testified that
the "principal concept of [his] damages analysis" was the value of
the Company with the Snap-On Letter agreement in tact [*sic*] less
the value of the Company without the Snap-On Letter agreement.
The best indication of the value of the Company with the Snap-On
Letter agreement, according to Mr. Gregory, is the $11.4 million
purchase price for which [PKA] acquired the Company.  Mr.
Gregory explained that "the price paid in an arm's length
transaction, especially with the process that was as robust as an
auction process[,] … is the Holy Grail of valuation indications."  Mr.
Gregory employed the discounted cash flow analysis to determine
[that] the value of the Company without the Snap-On Letter
agreement was $9.3 million.  Accordingly, Mr. Gregory concluded
that the appropriate damages for [the selling shareholders']
breach was $2.1 million — $11.4 million minus $9.3 million.

[Mr. Pass's] expert witness, Thomas Pratt, testified that [PKA]
acquired assets in excess of the purchase price.  Mr. Pratt also
testified [that] he performed several analyses to determine what
damages might have been suffered as the result of the diminished
sales to Snap-On.  Mr. Pratt then provided this [c]ourt with three
alternative lost[-]profits analyses[,] which yielded damages
ranging from $36,000.00 to $109,000.00.

For the following reasons, this [c]ourt finds Mr. Pratt's testimony
more credible and persuasive than Mr. Gregory's testimony.  First,
Mr. Gregory overstated the amount of lost EBITDA associated with
Snap-On's change in contract with the Company by understating
the amount of costs associated with the Snap-On business; Mr.
Pratt correctly determined the Company lost approximately
$109,000.00 in incremental profits from Snap-On in 2015.
Second, Mr. Gregory's valuation failed to consider the contractual
rights of Snap-On pursuant to the Snap-On Letter.  Third, Mr.
Gregory failed to properly consider the large and complex size of

_____

[4] Subsequently, in its Rule 1925(a) opinion, the trial court acknowledged that
"[its] [o]pinion incorrectly cited Pennsylvania law, although in only one
instance — the necessity of proving damages with reasonable certainty."  RO
at 4.  However, the trial court observed that Delaware's law on damages is
"the same[,]" and after citing to relevant Delaware cases, it concluded that
"using Delaware law does not change the [c]ourt's analysis."  ***See id.*** at 4-5.

the Company and its many other assets and liabilities. Fourth, Mr. Gregory failed to properly consider that Snap-On continues to be a single customer of [PKA's] business despite the cancel[l]ation of the Snap-On Letter.

Thus, [PKA] is unable to prove $2.1 million in damages with reasonable certainty where it solely relies on incredible expert testimony. This [c]ourt will not rewind the clock to determine what [PKA] would have paid for the Company based on Mr. Gregory's overstated valuation. However, we recognize Snap-On was able to terminate the Snap-On Letter within 120 days of notice. Assuming [PKA] knew of the termination at the time of the transaction, [PKA] would be entitled to 120 days of profit[s] from its business with Snap-On. For these reasons, we award [PKA] … $36,000.00 in damages based on Mr. Pratt's determination that the Company lost approximately $109,000.00 in incremental profits from Snap-On in 2015.

TCO at 11-13 (internal citations omitted).

Further, in its subsequent Rule 1925(a) opinion, the trial court added:

As for the $36,000 verdict, during the trial[,] the [c]ourt heard testimony from two expert witnesses, both of whom discussed in detail various methods for calculating damages. [PKA's] expert, Christopher Gregory, opined that [PKA's] damages were $2,100,000, his calculation of the difference in value of the [C]ompany with and without the Snap-[O]n contract. The [c]ourt did not find this testimony credible. The defense expert, Thomas Pratt, likewise opined as to his calculation of damages, although he generally used a lost-profits analysis. The [c]ourt found this testimony credible, and a better measure of damages actually suffered by [PKA] as a result of the breach. Specifically, the [c]ourt agreed with Mr. Pratt's analysis of $36,000 in lost profits…, as the [c]ourt found that Snap-[O]n was contractually bound to be a customer for only 120 days, and that $36,000 was a fair and reasonable estimate of lost profits suffered by [PKA] for those 120 days.

RO at 3-4.

## **Issue 1**

- 15 -

In PKA's first issue, it argues that, "[a]s a matter of law, the [t]rial [c]ourt applied an incorrect measure of damages to PKA's acknowledged loss." PKA's Brief at 19 (emphasis and footnote omitted). PKA states that "[t]he basic elements for breach of contract in Delaware include the existence of a contract, a breach of an obligation imposed by that contract, and 'resultant damage' to the plaintiff. This last element is key, as it means that the damages claimed and awarded for a breach must have 'flowed from the defendant's violation of the contract.'" ***Id.*** (citations omitted). PKA thereby insists that:

> [T]he [t]rial [c]ourt's award of 120 days of lost profits fails to meet this standard[,] as nothing the *shareholders* did caused PKA to lose 120 days of Snap-On profits. Rather, the shareholders' failure to disclose the loss of Snap-On caused PKA to overvalue the Company and to overpay for it. PKA's expectation was to receive the Company and the warranted customer relationships, and its damages flow from the shareholders['] failing to disclose the impairment of the Snap-On relationship. Thus, the damages "flowing" from the shareholders' violation is not "lost profits," but — as PKA has asserted all along — the amount by which PKA overpaid for the Company. Instead, the [t]rial [c]ourt illogically awarded damages that *the Company* would have been entitled to if *Snap-On* had breached the *Snap-On Contract* — but neither the Company nor Snap-On is a party to this case, nor is there any allegation that the Snap-On Contract was breached.

PKA's Brief at 20 (footnote omitted; emphasis in original).

In support of its argument, PKA cites to multiple Delaware cases, purportedly encompassing similar factual scenarios, where the non-breaching parties received damages constituting the difference between the amount the purchaser paid for a company and that company's actual value. ***See id.*** at 21-25. Additionally, PKA contends that, the lost-profits analysis based on the

- 16 -

120-day termination clause does not make sense, as "it is not the non-disclosure of the particular contract cancellation itself that constituted the breach of Section 3.15(a) of the Merger Agreement, but the non-disclosure of the 'material reduction' of the decades-long Snap-On 'relationship' that the contract represented." *Id.* at 26-27. As such, PKA says that "it is the value of the loss of this relationship, and the cash flow it represented, which is the proper measure of damages here." *Id.* at 27.

As PKA points out, it is well-established in Delaware that:

A claim for breach of contract … has three elements: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003). "To satisfy the final element, a plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013). "While courts will not award damages which require speculation as to the value of unknown future transactions, so long as the court has a basis for a responsible estimate of damages, and [the] plaintiff has suffered some harm, mathematical certainty is not required." *Thorpe v. CERBCO, Inc.*, 19 Del. J. Corp. L. 942, 963 (Del. Ch. Oct. 29, 1993) (Allen, C.).

"[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001). "It is a basic principle of contract law that remedy for a breach should seek to give the non[-]breaching the party the benefit of its bargain by putting that party in the position it would have been but for the breach." *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000). "Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached

contract, and, hence, what the promisee lost." **Duncan**, 775 A.2d at 1022.

**In re El Paso Pipeline Partners, L.P. Derivative Litig.**, 2015 WL 1815846, at *25 (Del. Ch. April 20, 2015). **See also LaPoint v. AmerisourceBergen Corp.**, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007) ("To be entitled to compensatory damages, plaintiffs must show that the injuries suffered are not speculative or uncertain, and that the [c]ourt may make a reasonable estimate as to an amount of damages. Yet such damages need not be demonstrated with mathematical accuracy: [the] plaintiffs need only to lay a reasonable foundation by which the [c]ourt may estimate their loss. On the other hand, where the amount of damages may not be estimated with reasonable certainty despite a showing of breach on the part of [the] defendant, the [c]ourt may still award nominal damages.") (footnotes omitted).

Here, the trial court concluded that PKA did not show the existence of damages provable to a reasonable certainty, as it found the testimony of PKA's expert — Mr. Gregory — not credible and less persuasive than the testimony of Mr. Pass's expert. TCO at 12-13. Consequently, the trial court stated that it "will not rewind the clock to determine what [PKA] would have paid for the Company based on Mr. Gregory's overstated valuation." **Id.** at 13. In other words, because the trial court found Mr. Gregory's determination of the value of the Company with and without Snap-On to be inflated and flawed in multiple respects, it declined to rely on his testimony to ascertain what PKA would have paid for the Company had it known about the cancellation of the Snap-On

Letter at the time of the transaction.[5] As Mr. Pass persuasively discerns, "[a] mere offer of a damage analysis is not the standard that must be met to receive a damage award. Rather, the damage award must be competent and must be believed. A fact[-]finder, in this case, the [t]rial [c]ourt, is not obligated to accept the testimony of any witness, and may believe all or none of a witness['s] testimony." Mr. Pass's Brief at 34-35. Further, as will be discussed further *infra*, Mr. Pass's expert — Mr. Pratt — opined that there was no way to determine any decrease in value that went along with the Snap-On relationship being lost. **See** Issue 2, **infra**. Therefore, as Mr. Pass aptly states, "[i]n the absence of any other viable damage analysis, the [t]rial [c]ourt concluded that the profit lost by PKA on the Snap-On relationship, for

---

[5] Thus, various cases cited by PKA prove distinguishable, as the courts in those cases found the plaintiffs' experts' damages testimony credible. **Cf. Cobalt Operating, LLC v. James Crystal Enterprises, LLC**, 2007 WL 2142926, at *4 (Del. Ch. July 20, 2007) (awarding in damages the difference between the actual value of a radio station at the time of the sale and the purchase price where the purchaser "**presented credible, and unrebutted, expert evidence** that, based on [the radio station's] legitimate cash flow, [the radio station] was worth substantially less at the time of the transaction than [the purchaser] paid") (emphasis added), and **In re El Paso Pipeline Partners, L.P.**, 2015 WL 1815846, at *2 ("The plaintiff's expert **demonstrated** at trial that El Paso MLP paid $171 million more for a 49% interest [in] Elba than it would have if the General Partner had not breached the LP Agreement. The General Partner is liable for that amount….") (emphasis added), **with LaPoint**, 2007 WL 2565709, at *10 (awarding only nominal damages where the plaintiff failed to demonstrate that the defendant's breach of a contract led to damages that could be fixed to a reasonable degree of certainty, noting that the defendant "had produced convincing evidence to suggest that even had [it] acted in complete good faith, [the plaintiff's former company] was unlikely to achieve considerably greater success").

the 120 day notice period, was an appropriate measure of damages." *Id.* at 49.[6]  Accordingly, given the valuation evidence before it, we conclude that the trial court did not err in failing to award damages for the difference between the amount PKA paid for the Company and its actual value.

## Issue 2

In PKA's second issue, it argues that "[t]he [t]rial [c]ourt erred or abused its discretion in completely ignoring one of PKA's damages analyses, and in failing to consider the other."  PKA's Brief at 27 (emphasis and footnote omitted).  It states that "PKA presented two damages valuations at trial based upon the proper methodology under Delaware law: First, [Nirav] Amin offered an EBITDA analysis, which calculated $1.625 million of damages.[7]  Second, Mr. Gregory offered a discounted-cash-flow analysis, which calculated $2.1 million of damages.  The [t]rial [c]ourt's failure to consider these analyses was error." *Id.*

*Mr. Amin's Analysis*

---

[6] As Mr. Pass discerns, because the trial court found that PKA had not proffered credible evidence on damages, the trial court could have entered a verdict for only nominal damages.  **See** Mr. Pass's Brief at 35; **see also LaPoint**, **supra**.

[7] Mr. Amin was an analyst at V&A Capital, an affiliate of PKA, at the time of the at-issue deal.  N.T. Trial, 2/5/18-2/7/18, at 177; **see also id.** at 22, 23 (Mr. Vergani's, the owner of V&A Capital, testifying that "V[&]A is an affiliate of [PKA] in that I am the owner of the majority of the shares of [PKA]").  Essentially, V&A Capital acquired the Company.  **Id.** at 248.  Mr. Amin was involved in that transaction from the beginning, gathering information and doing "financial due diligence, market research, financial modeling and stuff." **Id.** at 192; **see also id.** at 177-78 (same).

We begin by considering PKA's argument that the trial court "failed to even acknowledge, let alone consider, the alternative damages analysis offered by … Mr. Amin." PKA's Brief at 28 (emphasis omitted). PKA explains that, "[b]ecause PKA's $11.4 million offer to purchase the Company was based on the Company's anticipated cash flow/EBITDA, Mr. Amin … used an EBITDA analysis to calculate how much of that $11.4 million purchase price had pertained to the undisclosed, lost Snap-On revenue. This resulted in a damages estimate of $1.625 million…." *Id.* (internal citations omitted). PKA complains that, even though it raised below that the trial court should have awarded damages based on Mr. Amin's analysis in its post-trial motion and Rule 1925(b) statement, none of the trial court's opinions addressed this issue. *Id.* Further, PKA claims that there is no "basis to assume that the [t]rial [c]ourt simply found Mr. Amin to lack credibility[,]" and asserts that the trial court's opinions suggest that it forgot that Mr. Amin offered an alternative analysis. *Id.* PKA argues that this lack of recognition was either legal error, or at least an abuse of the court's discretion. *Id.* at 29.

We disagree. Although PKA is correct that the trial court did not specifically mention Mr. Amin's analysis in either of its opinions, it is clear that the trial court focused on the experts' trial testimony regarding damages, and weighed their analyses more heavily than the damages analysis of Mr. Amin, a lay witness. Indeed, Mr. Amin even admitted at trial that his damages calculation is not as detailed or thorough as Mr. Gregory's expert report. N.T. at 266. Mr. Amin explained that his calculation constituted "kind of our initial

- 21 -

estimate of the damages to provide us a framework of how the value of [the Company] decreased … due to the loss of Snap-On. It is not … as detailed of an analysis that an expert in this area whose job is calculating damages and doing … other similar things would do." *Id.* at 266-67. Similarly, Mr. Gregory characterized Mr. Amin's analysis as "more high level, more back of the envelope, and [it] didn't really get to the guts of the issue, which was how much lost cash flow is there as a result of the materially lower performance of Snap-On going forward." *Id.* at 357. In addition to such promotion of Mr. Gregory's testimony over Mr. Amin's at trial, "[t]he trial court, as the finder of fact, is free to believe all, part or none of the evidence presented. Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determination or substitute our judgment for that of the fact finder." *Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P.*, 181 A.3d 1188, 1192 (Pa. Super. 2018) (citations and internal quotation marks omitted).[8] Accordingly, we see no reason to grant PKA relief based on the trial court's purported lack of attention to Mr. Amin's testimony.

*Mr. Gregory's Analysis*

---

[8] Moreover, Mr. Pass persuasively argues that Mr. Amin's analysis contains many of the same flaws as Mr. Gregory's analysis, discussed *infra*. Mr. Pass's Brief at 23-26. For instance, Mr. Pass points out that Mr. Amin's analysis "employs the same flawed 'stand-alone' business analysis that [Mr.] Gregory employed, with no accounting for the risks of the single customer nature of that business…." *Id.* at 26.

With respect to Mr. Gregory's analysis, PKA maintains that the trial court's "failure to credit [his] analysis was improper and demonstrably not based on a credibility determination." PKA's Brief at 29 (emphasis omitted). PKA advances:

> While actual credibility determinations are generally the prerogative of the factfinder (e.g., whether to believe a plaintiff when she claims a light was red, and not green), the [t]rial [c]ourt's October 2018 [o]pinion reveals that its disregard of Mr. Gregory's analysis was not actually based upon a credibility determination, but on four specific complaints about Mr. Gregory's discounted-cash-flow analysis:
>
> > For the following reasons, this [c]ourt finds Mr. Pratt's testimony more credible and persuasive than Mr. Gregory's testimony. First, Mr. Gregory overstated the amount of lost EBITDA associated with Snap-On's change in contract with the Company by understating the amount of costs associated with the Snap-On business; Mr. Pratt correctly determined the Company lost approximately $109,000.00 in incremental profits from Snap-On in 2015. Second, Mr. Gregory's valuation failed to consider the contractual rights of Snap-On pursuant to the Snap-On Letter. Third, Mr. Gregory failed to properly consider the large and complex size of the Company and its many other assets and liabilities. Fourth, Mr. Gregory failed to properly consider that Snap-On continues to be a single customer of [PKA's] business despite the cancel[l]ation of the Snap-On letter.
>
> [TCO at 12].

*Id.* at 29-30. PKA contends that "the first reason — even if true — did not merit a complete disregard of Mr. Gregory's methodology, and the remaining three reasons are demonstrably false." *Id.* at 30.

Initially, PKA's argument that the trial court did not disregard Mr. Gregory's analysis due to a credibility determination puzzles us. At trial, Mr. Gregory and Mr. Pratt presented different theories on the proper measure of

damages in this case, with Mr. Gregory, determining through a discounted-cash-flow analysis, that PKA suffered $2.1 million in damages, and Mr. Pratt using an alternative lost-profits calculation to opine that PKA suffered between $36,000 and $109,000 in damages. Given these conflicting opinions, the trial court had to make credibility determinations, as it could not believe both experts and credit both of their estimations. Accordingly, the trial court determined, and stated numerous times, that it did not find Mr. Gregory's testimony credible. *See* TCO at 12, 13; RO at 4, 5. The four specific complaints mentioned by the court *supra* provide its reasons for why it found Mr. Gregory's testimony less believable and persuasive than Mr. Pratt's testimony. Thus, it seems to us that PKA's argument is more aptly construed as challenging the trial court's findings regarding credibility and weight of the evidence, *i.e.*, its choosing to believe Mr. Pratt over Mr. Gregory, instead of that the trial court's disregard of Mr. Gregory's analysis was not based upon a credibility determination.

"[T]his Court has stated that we will respect a trial court's findings with regard to the credibility and weight of the evidence unless the appellant can show that the court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence." *Gutteridge v. J3 Energy Corp., Inc.*, 165 A.3d 908, 914 (Pa. Super. 2017) (*en banc*) (citation omitted). Further, we reiterate that,

> [i]n a non-jury trial, the factfinder is free to believe all, part, or none of the evidence, and the Superior Court will not disturb the trial court's credibility determinations. Assessments of credibility

- 24 -

and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgments for those of the factfinder. The test is not whether this Court would have reached the same result on the evidence presented, but rather, after due consideration of the evidence the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Id.* at 916 (internal citations and quotation marks omitted).

To begin, we set forth Mr. Gregory's following description of the discounted-cash-flow methodology that he used to ascertain the difference between the represented value and actual value of the Company:

I started with what I call Step 1, or the calibration step. And I took advantage of the fact that we had a purchase price that had been negotiated between arm's length third parties, and at the same time, we had a deal model that had forecasted cash flows that were prepared contemporaneous with the closing of the transaction.

So I was able to use discounted cash flow methodologies to estimate the required rate of return or [what we] call the IRR, the internal rate of return[,] that was implied by that arm's length purchase price on the one hand and the cash flows that were prepared at the time the purchase price was arrived at.

So I calculated this discount, what I call the discount rate or IRR, to be 12.7 percent, so that calibrated discount rate is then appropriate to use in the ex-Snap-On, using your terminology, set of cash flows, which was the second step in my analysis.

So I did a calibration, came up with the discount rate of 12.75 percent and then in Step 2, I adjusted -- I forecasted new cash flows based on the materially reduced level of sales to Snap-[O]n.

We spent quite a bit of time going through precisely how I did that. Once you have those new cash flows, you can apply the same discount rate that I developed in Step 1 to the new cash flows to arrive at the corrected purchase price or the value of the company ex[-]Snap-[O]n, and then the difference between what was paid and the value actually received, because of this reduced Snap-[O]n relationship, again, was my damages analysis.

N.T. at 305-06.

At trial, Mr. Pass's expert, Mr. Pratt, contested Mr. Gregory's analysis on numerous fronts, and Mr. Pratt's "fundamental conclusion was that [Mr. Gregory] significantly overstated … the financial damages that may have been experienced by the buyers as a result of the termination of the Snap-[O]n agreement." *Id.* at 515. Aside from disagreeing with Mr. Gregory about the amount of costs associated with the Snap-On business, *see id.* at 518-24, Mr. Pratt assessed that Mr. Gregory used only one common valuation method to look at the value of the Company, *id.* at 530-31, testified that he had not seen any evidence that PKA performed any discounted-cash-flow analysis when it evaluated the Company before buying it, *id.* at 516, 517-18, and attacked Mr. Gregory's competence by observing that Mr. Gregory had to correct his expert report before trial due to a mismatch of the cash flows he used in his analysis, *id.* at 529-30; *see also id.* at 410-11.

Mr. Pratt also criticized Mr. Gregory's analysis for treating the risk posed by the Snap-On contract the same as the risk posed by a whole enterprise with multiple contracts and customers through the IRR — or multiplier — he used, *see id.* at 547-51, 622-23. Specifically, Mr. Pratt testified:

> [Mr. Pass's counsel:] And when you're valuing an enterprise and applying a multiplier, you apply that multiplier to the entire enterprise; is that correct?
>
> [Mr. Pratt:] It can be applied to enterprise value; it can be applied to invested capital. Again, you have to make sure that you're matching multiples and incomes streams to get to an answer, but yes.

[Mr. Pass's counsel:] I guess my question simply was have you ever seen a valuation where parts of the business are valued based upon a multiplier and then they aggregate all those multipliers or multiple numbers to come to a valuation?

[Mr. Pratt:] No.

[Mr. Pass's counsel:] All right. And when you value an enterprise, as you said, part of that multiplier is the risk associated with the enterprise?

[Mr. Pratt:] Yes.

[Mr. Pass's counsel:] And if an enterprise has a broad group of customers who have been customers for a long time --

[Mr. Pratt:] Uh-huh.

[Mr. Pass's counsel:] -- barring any unusual circumstances, that presents one sort of risk level; correct?

[Mr. Pratt:] Yes.

[Mr. Pass's counsel:] And if an enterprise has a single customer, that represents another risks rating; correct?

[Mr. Pratt:] Yes.

[Mr. Pass's counsel:] And if an enterprise has customers that have certain contracts where the price is set and there is a term set and there is a quantity set and you know exactly what this contract is going to … generate in terms of revenue and profit, that would represent one type of risk; correct?

[Mr. Pratt:] Correct.

[Mr. Pass's counsel:] And then if you have contracts where the price is renewed or revised annually, and there is termination provisions for convenience, no obligation to purchase in addition, that would represent another category of risk?

[Mr. Pratt:] Yes.

[Mr. Pass's counsel:] And that's what we have here?

[Mr. Pratt:] That's correct.

[Mr. Pass's counsel:] Now, in this particular case, we have this enterprise valuation, and if we take one contract, which is the

Snap-[O]n contract, out, and then perform a valuation based just on that exclusion, that's what Mr. Gregory did; correct?

[Mr. Pratt:] That's what he attempted to do, yes. Yes.

[Mr. Pass's counsel:] Okay. So now if you take one contract out and it doesn't have this requirement…, there is no obligation to buy anything under this contract, is the risk and is the way you would look at that the same as the way you would look at an enterprise with multiple parties, multiple contracts, multiple relationships?

[Mr. Pratt:] No. I wouldn't have them be comparable, no.

[Mr. Pass's counsel:] Would the risk of valuing a business with one contract such as the Snap-[O]n contract be higher than the risk associated with the value of the full enterprise?

[Mr. Pratt:] Yes.

[Mr. Pass's counsel:] And if the risk is higher, what does that do to the price?

[Mr. Pratt:] The risk is higher, that drives the price down.

[Mr. Pass's counsel:] Okay. So if I were hypothetically to say, []I want you to value a business that has the assets that this business has or enough of those assets to serve just one customer, Snap-On, and that's their only customer, and the revenue are what they were up through 2013, are you going to put the same kind of value on that that you would put on a total enterprise?

[Mr. Pratt:] No.

[Mr. Pass's counsel:] And isn't that what Mr. Gregory did?

[Mr. Pratt:] Actually, I think he did even more than that. Because he ends up with a disproportionate … value related to Snap-[O]n compared to Snap-[O]n's contribution to the business.

[Mr. Pass's counsel:] So not only were the revenue numbers or the profit numbers wrong, but also he treated this contract the same as this whole enterprise in terms of risk and the value of that contract?

[Mr. Pratt:] Yes.

*Id.* at 548-51.

- 28 -

Furthermore, Mr. Pratt testified that Mr. Gregory's analysis incorrectly represented that PKA purchased the Company for $11.4 million, instead of $7.4 million. *See id.* at 515-16, 529, 538-39.[9] Mr. Pratt stated that the value of the Company at the time of the transaction exceeded the net actual purchase price of $7.4 million. *Id.* at 538-40.[10] As a result, Mr. Pratt reached

_____

[9] In Mr. Pratt's expert report, he explained:

> The Gregory Report erroneously assumes that the Buyer paid $11.4 million for the Company at closing. Although $11.4 million was the Base Merger Consideration amount indicated in the Agreement, the Base Merger Consideration was reduced by $4.0 million for an Underfunded Pension Liability Amount. Therefore, the net actual purchase price for the Company's invested capital was $7.4 million ($11.4 million-$4.0 million).

Joint Exhibit 42, at 4 (footnote omitted).

[10] In Mr. Pratt's report, pursuant to the three common approaches used in determining fair market value (*i.e.*, the income approach, the market approach, and the asset approach), he further detailed:

> Given the net asset value of approximately $9.3 million, and the indicated values under the income and market approaches of $10.6 million and $9.3 million to $10.1 million, respectively, the fair market value of the Company as of the transaction date would have ranged between approximately $9.3 million and $10.6 million.

> The net actual amount paid by the Buyers of $7.4 million was already less than the fair market value of the Company according to our analysis. Therefore, the Buyers received the benefit of their bargain in spite of the Omission and the loss of business from Snap-On from the Termination.

Joint Exhibit 42, at 7-8.

a different conclusion about the actual damages suffered as a result of the diminished Snap-On relationship, stating:

> [T]he items that we considered were that because the assets were greater than the purchase price, and the assets didn't change with or without the Snap-On relationship, that there was no way to determine any decrease in value that went along with that Snap-On relationship being lost, because the assets are always an undergirding or sanity check on value.
>
> So the asset values didn't change either way, and so then [we] went to look for, okay, well, if there is no change in value that's indicated, fair market value, what other methods would be used or could be used to evaluate the loss.
>
> In that case, we just looked at the simple lost[-]profits calculation.

*Id.* at 539-40; *see also id.* at 608 (Mr. Pratt's testifying that the purchase price that PKA paid for the Company "is less than the tangible assets so … there can be no significant intangible value to those customer relationships, given the price that was paid in this case").[11]

---

[11] Given the numerous errors pointed out by Mr. Pratt with Mr. Gregory's method, including the amount PKA actually paid for the Company, we reject PKA's argument that the trial court should have "simply substituted Mr. Pratt's final incremental profits number into Mr. Gregory's analysis — or even simply have relied on Mr. Pratt's own discounted-cash-flow analysis…." PKA's Brief at 30-31. We further observe that, when asked if Mr. Pratt thought Mr. Gregory's discounted-cash-flow methodology was fine other than the cost input, Mr. Pratt responded, "It is not my approach; it was his. I was just correcting and reflecting adjustments or corrections to his analysis." N.T. at 592-93. *See also id.* at 609 (Mr. Pratt's criticizing Mr. Gregory's analysis as it implies that "all of the value is related to the customer relationships[,]" which Mr. Pratt said cannot be true given "the amount of the tangible assets of the business").

Based on the foregoing, we determine that the record supports the trial court's findings with regard to the credibility and weight of the evidence.[12] PKA has not shown that the court's findings were "manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence." **Gutteridge**, 165 A.3d at 914. Mr. Pass presented evidence that Mr. Gregory's analysis understated the costs associated with Snap-On's business, did not properly consider Snap-On's contractual rights in valuing the business, did not properly account for the Company's large size and assets, and did not properly contemplate how pricing is affecting the Company's ability to obtain work from Snap-On following the acquisition. Further, there is support in the record for the $36,000 in damages ultimately awarded by the trial court. **See** N.T. at 539-42 (Mr. Pratt's endorsing a lost-profits calculation yielding $36,000 in damages); **see also** Joint Exhibit 42. Accordingly, the trial court's failure to credit Mr. Gregory's analysis was not improper.

## Issue 3

In PKA's third issue, it argues that the trial court "erred in holding that PKA failed to establish its damages 'with reasonable certainty' when PKA

---

[12] In addition to the above-stated evidence, we note that Mr. Gregory was unaware that Snap-On could terminate the agreement the day after the merger, **see** N.T. at 352-53, and he did not know that pricing competition had become fierce and that the Company lost (and continued to lose) Snap-On's business because the Company's pricing was undercut. **Id.** at 354-55; **see also id.** at 218-22 (Mr. Amin's acknowledging that companies have to price their products so they can make a profit and sell them, and that after the acquisition, the Company submitted a bid for $2.28 million worth of work to Snap-On, and did not get the work because its pricing was higher than its competitor on at least $1.5 million dollars of that work).

presented two alternate, detailed damages analyses." PKA's Brief at 35 (emphasis and footnote omitted). Quoting **Thorpe**, 19 Del. J. Corp. L. at 963, PKA explains that, "[w]hile courts will not award damages which require speculation as to the value of unknown future transactions, so long as the court has a basis for a responsible estimate of damages, and [the] plaintiff has suffered some harm, mathematical certainty is not required." PKA's Brief at 35-36. PKA contends that its "two alternate damages analyses — which were supported by financial statistics, documentation, detailed calculations, and testimony — more than meet this standard." *Id.* at 37. In addition, it says that Mr. Pratt "used similar valuation methodologies in his own expert report, showing that PKA's valuations were far from speculative[,]" and, as such, the trial court "had at least five competing valuations of the Company without Snap-On — from both parties — that could have served as a basis to award PKA the proper measure of damage…." *Id.* (emphasis omitted). According to PKA, the trial court inexplicably "abandoned valuation completely and resorted to the wrong measure of damages[,]" and therefore the trial court's finding that PKA failed to prove its damages with 'reasonable certainty' was error. *Id.*

> No relief is due. As Mr. Pass aptly asserts:
>
> Based upon all of the evidence and testimony, the [t]rial [c]ourt held:
>
> > Thus, [PKA] is unable to prove $2.1 million in damages with reasonable certainty where it solely relies on incredible expert testimony.
>
> [TCO at 13].

Perhaps due to the use of the [t]rial [c]ourt's phrase "reasonable certainty[,"] PKA confuses the burden of proving damages with "reasonable certainty" with the overarching burden of proving by credible evidence the damages claimed. PKA bears the burden of proof and the burden of persuasion with respect to its damage claims. As the [t]rial [c]ourt said, if the only evidence offered to support its damage claim is the "incredible" testimony of a witness - a witness that the [t]rial [c]ourt specifically found not to be credible [-] that burden of proof is not met.

PKA[] is attempting to use the phrase "reasonable certainty" to bootstrap an argument that the evidence was sufficiently specific to pass the "reasonable certainty" test. However, as noted above, the phrase was not used as PKA would have this Court believe. Rather, the phrase was used to communicate that PKA had failed entirely in its burden of proof, because its expert was not believed. ***The [t]rial [c]ourt did not find that Mr. Gregory's testimony was not precise enough. Instead, the [t]rial [c]ourt found that [Mr.] Gregory's testimony was simply not believable.***

Mr. Pass's Brief at 22-23 (some emphasis added; some emphasis omitted). We agree. Further, to the extent PKA complains that the trial court should have used one of Mr. Pratt's valuations, we reiterate that Mr. Pratt did not recommend using such valuations to measure damages, but instead endorsed applying a lost-profits calculation. **See** Issue 2, **supra**. Therefore, no relief is due.

## Issue 4

In PKA's fourth and final issue, it argues that "the amount of damages awarded was grossly inadequate, does not make sense based on the [t]rial [c]ourt's other factual findings, and does not have a reasonable relationship to the loss suffered by PKA.'" PKA's Brief at 38 (emphasis and footnote omitted). Quoting **Kiser v. Schulte**, 648 A.2d 1, 4 (Pa. 1994), PKA asserts that "[a] damages award will be set aside as inadequate 'where it clearly

appears from uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff.'" PKA's Brief at 38. PKA argues that "[t]he intentional (or negligent) concealment of the loss of a $3 million-per-year customer, which constituted more than 10% of the Company's revenue over an extensive period of time, is clearly worth significantly more than $36,000. The [t]rial [c]ourt's low award therefore bears no 'reasonable relation' to PKA's loss, and should be overturned." *Id.* at 40.

This argument lacks merit. PKA's reliance on *Kiser* is misplaced. In that case, "the uncontroverted testimony of the [a]ppellee's expert established that the net economic loss resulting from [the decedent's] death ranged from $232,400 to $756,081.43. The defense did not present any other experts or any other evidence to the contrary on the question of damages." *Kiser*, 648 A.2d at 6 (footnote omitted). Nevertheless, the jury awarded the appellee only $25,000 in damages. *Id.* at 3. Our Supreme Court vacated the jury's verdict and remanded for a new trial on damages, as it could "find no basis for this award in any of the evidence produced at trial." *Id.* at 5. In doing so, the Court determined that "the jury totally disregarded the only evidence presented on the question of damages and settled on a somewhat capricious and inadequate amount of $25,000. The jury verdict here simply does not bear any rational relationship to the uncontroverted testimony presented by [the appellee's expert]." *Id.* at 6 (footnote omitted).

The circumstances of **Kiser** are clearly distinguishable from the matter at hand. Here, the parties presented competing evidence on the issue of damages. Even more, Mr. Pass's expert specifically submitted a damages analysis ascertaining that PKA suffered $36,000 in damages due to the selling shareholders' breach. Therefore, unlike in **Kiser**, the evidence produced at trial provided a basis for the trial court's award. Thus, this argument also fails.

### Mr. Pass's Appeal

We now turn to Mr. Pass's cross-appeal challenging the trial court's award of attorneys' fees and costs to PKA in the amount of $384,309.42. He raises the following issue for our review:

> Was the [t]rial [c]ourt correct in awarding attorney[s'] fees and costs under the terms of the [m]erger [a]greement and the findings of the [t]rial [c]ourt?

Mr. Pass's Brief at 4.

> We apply the following standard of review:

> Our standard of review of an award of attorney[s'] fees is well settled: we will not disturb a trial court's determinations absent an abuse of discretion. A trial court has abused its discretion if it failed to follow proper legal procedures or misapplied the law.

**Kessock v. Conestoga Title Insurance Co.**, 194 A.3d 1046, 1059 (Pa. Super. 2018) (citation omitted).[13]

*Reasonableness of Fee Award*

---

[13] Mr. Pass failed to include a statement of the standard of review for this claim in his brief, so we apply the standard set forth by PKA. Mr. Pass's Brief at 1-3.

Mr. Pass advances three sub-arguments in support of his claim that PKA is not entitled to an award of attorneys' fees and costs in the amount of $384,309.42. First, he complains that "the fees awarded were unreasonable in light of the outcome." Mr. Pass's Brief at 49 (emphasis omitted). The Delaware Supreme Court has explained:

> Delaware law dictates that, in fee shifting cases, a judge determine[s] whether the fees requested are reasonable. To assess a fee's reasonableness, case law directs a judge to consider the factors set forth in the Delaware Lawyers' Rules of Professional Conduct, which, include:
>
> > (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> >
> > (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> >
> > (3) the fee customarily charged in the locality for similar legal services;
> >
> > (4) the amount involved and the results obtained;
> >
> > (5) the time limitations imposed by the client or by the circumstances;
> >
> > (6) the nature and length of the professional relationship with the client;
> >
> > (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> >
> > (8) whether the fee is fixed or contingent.

***Mahani v. Edix Media Group, Inc.***, 935 A.2d 242, 245-46 (Del. 2007) (footnotes omitted).[14]

---

[14] Both parties agree that Delaware law applies to evaluating the trial court's fee award.

- 36 -

Though Mr. Pass does not dispute the quality of PKA's representation, the time and labor required, and the hourly rates of PKA's counsel, he argues that, when weighing these factors, particularly the 'results obtained' factor, "the scale tips in favor of an award of significantly less than the fees and expenses sought in this matter." Mr. Pass's Brief at 51, 53. Mr. Pass observes that, in *Mahani*, the Delaware Supreme Court upheld an award of $103,454.50 in attorneys' fees and $6,184.28 in expenses where the plaintiff had received an award of $16,500.06 in damages on a $45,000 claim. *Id.* at 51 (citing *Mahani*, 935 A.2d at 245). However, Mr. Pass points out that, in *Mahani*, the trial court "found that the defendant's 'refusal to cooperate at every stage of the proceedings outweighed [the plaintiff's] limited trial success and contributed significantly to the excessive number of hours [the plaintiff] spent litigating the case.'" *Id.* (quoting *Mahani*, 935 A.2d at 243). In comparing *Mahani* to the case at bar, Mr. Pass discerns that the award in *Mahani* represented more than 36% of the amount claimed whereas PKA was awarded about 2% of the amount it claimed to be due. *Id.* at 52. Moreover, he adds that his conduct in this matter did not involve contemptuous behavior. *Id.*

Here, after recognizing that "the parties have generally stipulated to the reasonableness of the bills regarding time spent, the complexity of the issues, etc.," the trial court rationalized:

[Mr. Pass's] primary issue is with … the results achieved.

[Mr. Pass] argues that because the verdict of $36,000 was significantly below the $2,100,000 sought by [PKA], the result

achieved was not one that would warrant the award of significant attorneys' fees. However, this case was about more than merely the amount of damages to be awarded, as [Mr. Pass's] posture at trial was that there was no breach. [PKA] sought to have this [c]ourt find one or more breaches of contract, and the [c]ourt so found.

We therefore reject any contention that [PKA's] trial success was limited. In any event, the amount of trial success would not limit our discretion. "The reasonableness of attorneys' fees and other expenses in a contractual fee shifting case should be assessed by reference to legal services purchased by those fees, not by reference to the degree of success achieved in the litigation." *Mahani*[, 935 A.2d] at 248. To the extent that [Mr. Pass] argues that the attorneys' fees are excessive in relation to the actual verdict, the *Mahani* [C]ourt allowed an award of $103,454.50 in attorneys' fees and $6,184.28 in costs, on a $16,500.06 compensatory damage award. *Id.* The fact is that it is undisputed that [the selling shareholders] breached the Merger Agreement, which resulted in significant legal costs to [PKA]. This [c]ourt finds [PKA] should be reimbursed for all reasonable costs resulting from the [selling shareholders'] breach, and the [c]ourt finds attorneys' fees of $384,309.42 to be reasonable under the circumstances.

RO at 7-8. We ascertain no abuse of discretion. Further, we note that the

*Mahani* Court stated that "there is no law that stipulates that the amount of

the prevailing party's attorneys' fees and other expenses awarded pursuant

to a contractual fee provision must be less than or in proportion to the amount

of its award for damages." *Mahani*, 935 A.2d at 248 n.23. Thus, we decline

to disturb the trial court's award on this basis.

*Costs Related to Expert Witness Fees*

Second, Mr. Pass argues that, because the trial court found PKA's expert

testimony to be unhelpful in determining the case, PKA should not be awarded

expert witness fees. Mr. Pass's Brief at 53-54. He explains that "it is apparent

that Delaware law permits a court to consider the helpfulness of expert

testimony in deciding the reasonableness of a request for expert witness fees."

*Id.* at 54.

In the case *sub judice*, the trial court explained why it included expert witness fees in its award as follows:

> [Mr. Pass] does not argue that the fee was excessive in terms of what a typical expert would have charged, or the amount of time spent by the expert. The court's reliance on an expert's opinion is not a prerequisite to an award for the costs of that expert, so long as the testimony is helpful. ***Arbitrium (Cayman Islands) Handels AG v. Johnson***, 705 A.2d 225 (Del. Ch. 1997). ***See also Weinberger v. UOP Inc[.]***, 517 A.2d 653[, 657] (Del. Ch. 1986), where the court held it was "not unmindful of the fact that the discounted cash flow analysis advanced by [the] plaintiffs' expert was not adopted by this [c]ourt either at the original trial or on remand. [H]owever, reliance upon the expert is not a prerequisite to the award of fees." Again, it was [Mr. Pass's] breach of the Merger Agreement that resulted in the instant litigation, which required the retention of the expert witness. Therefore, [PKA] is entitled to be reimbursed for that expense.

RO at 10.

Mr. Pass has not convinced us that the trial court abused its discretion in this regard. He cites to ***Barrows v. Bowen***, 1994 WL 514868 (Del. Ch. Sept. 7, 1994), explaining that the court in that case declined to award expert witness fees where it found the expert testimony not helpful to the resolution of the case. Mr. Pass's Brief at 53. However, the expert in that case was to evaluate the mental capacity of an elderly person, and the court explained that it "did not give weight" to that expert's opinion as the expert "had never met with" the elderly person, and "derived her conclusions after assessing a mere portion of the evidence" that was before the court. ***Barrows***, 1994 WL 514868, at *3. The ***Barrows*** Court explicitly stated that it "did not find [the

- 39 -

expert's] opinion helpful in assessing [the elderly person's] mental condition or on the legal questions of any consequent incapacity to contract. [The expert] had no exposure to [the elderly person]." *Id.* What is more, the *Barrows* Court opined that "[t]he evaluation of the mental capacity of an elderly person can be difficult, as the court knows from many litigations over testamentary capacity. [The expert], in my opinion, did not provide evidence that substantially advance[s] that inquiry in this instance." *Id.* Conversely, in the case at bar, the trial court did not specifically find Mr. Gregory's testimony unhelpful, but instead "gave more weight to the testimony of the defense expert, Mr. Pratt, rather than [PKA's] expert, Mr. Gregory." RO at 5; *see also* TCO 12 (stating that it "finds Mr. Pratt's testimony more credible and persuasive than Mr. Gregory's testimony"). Moreover, as the trial court mentioned, it did not have to rely on Mr. Gregory's opinion in order to award expert witness fees to PKA. *See also Weinberger*, *supra*. Accordingly, Mr. Pass has not demonstrated that the trial court abused its discretion on this basis.

*Indemnity Provision*

Finally, Mr. Pass argues that "[t]he indemnity provision of the acquisition agreement precludes recovery of attorneys' fees and costs where the aggregate recovery was less than $100,000." Mr. Pass's Brief at 54 (emphasis omitted). To address this claim, we set forth the relevant provisions of the agreement, which provide the following:

Section 8.02 **Indemnification By Shareholders.** Subject to the other terms and conditions of this **Article VIII**, the Shareholders, severally and not jointly (in accordance with their Pro Rata Shares), shall indemnify and defend each of Parent and its Affiliates (including the Surviving Corporation) and their respective Representatives (collectively, the "**Parent Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Parent Indemnitees based upon, arising out of, with respect to or by reason of:

(a) any inaccuracy in or breach of any of the representations or warranties of the Company contained in this Agreement or in any certificate or instrument delivered by or on behalf of the Company pursuant to this Agreement as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Company pursuant to this Agreement;

\*\*\*

Section 8.04 **Certain Limitations.** The indemnification provided for in **Section 8.02** and **Section 8.03** shall be subject to the following limitations:

(a)     (i) Shareholders shall not be liable to the Parent Indemnitees for indemnification under **Section 8.02(a)** until the aggregate amount of all Losses in respect of indemnification under **Section 8.02(a)** exceeds $100,000 (the "**Basket**"), in which event the Shareholders shall be required to pay or be liable for all such Losses in excess of $50,000. (ii) The aggregate amount of all Losses for which Shareholders shall be liable pursuant to **Section 8.02(a)** and **Section 6.03** shall not exceed $2,250,000 (the "**Cap**").

Joint Exhibit 25, at 55, 56.

The agreement defines "Losses" as:

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however, that* "**Losses**" shall not include punitive damages, except to the extent actually awarded to a Governmental Authority or other third party, or any consequential damages, except to the extent awarded, paid or incurred in connection with a claim by a Governmental Authority or other third party.

*Id.* at 9 (emphasis in original).

We further observe that "[t]he interpretation of the terms of a contract is a question of law for which our standard of review is *de novo*, and our scope of review is plenary." **Kessock**, 194 A.3d at 1059 (citation omitted). In addition, Delaware's Supreme Court has explained:

Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party. When interpreting a contract, this Court will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions. Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language. Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract.

**Salamone v. Gorman**, 106 A.3d 354, 367-68 (Del. 2014) (internal quotation marks and footnotes omitted).

Here, the trial court concluded that PKA's losses "are in excess of $100,000 for purposes of Section 8.04. [PKA's] losses are the $36,000 verdict, plus the $384,309.42 in fees and costs." RO at 9. Mr. Pass contests this determination, asserting that, under the definition of "Losses," "the

attorney[s'] fees and costs are recoverable only for '… enforcing any ***right*** to indemnification…[.]'" ***See*** Mr. Pass's Brief at 57 (emphasis in original). He thereby contends:

> [W]hen evaluating the claim for attorney[s'] fees, the question is whether PKA has a 'right to indemnification[.']  The answer is – no.  As noted above, the indemnification provision itself states that "… the shareholders shall not be liable … for indemnification…" unless certain conditions are met, including the condition that the indemnification loss exceeds $100,000, and even then, there is no liability for the first $50,000 of any indemnification loss.
>
> In this case, PKA was awarded $36,000, an amount not sufficient to make the shareholders liable for indemnification.  Simply stated, if there is no liability for indemnification, there is no corresponding right to indemnification.  If there is no right to indemnification, there can be no award for attorney[s'] fees and costs, which under the express terms of the [a]cquisition [a]greement, are only to be awarded for enforcing a "***right*** to indemnification[."]

***Id.*** (emphasis in original).

We reject this argument.  The plain language of Section 804(a)(i) states that the selling shareholders shall not be liable for indemnification pursuant to Section 8.02(a) until the aggregate amount of all Losses exceeds $100,000. The definition of Losses specifically includes expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification.  As PKA indicates, Mr. Pass "engages in significant verbal gymnastics to create ambiguity where none exists."  PKA's Reply Brief at 24. We agree with PKA, and determine that PKA's losses are in excess of $100,000 for purposes of Section 8.04(a)(i).

Nevertheless, the trial court recognized in its Rule 1925(a) opinion that Mr. Pass "may exclude the first $50,000 of losses in accordance with Section 8.04(a)[,]" and therefore noted that PKA's "[j]udgment on the [v]erdict should be revised to reflect this." RO at 9.[15] We agree with the trial court that, if Section 8.04(a)(i) applies, it should subtract $50,000 from PKA's award. However, PKA contends that Section 8.04(a)(i) should not apply to reduce its recovery because the trial court found that the selling shareholders committed a breach of affirmative obligations and covenants under Section 5.05(a) of the Merger Agreement, which PKA says is not subject to Section 8.04(a)(i)'s limitations because it falls under Section 8.02(b), not Section 8.02(a). **See generally** PKA's Reply Brief at 21-23.[16] Though PKA raised this argument below, it does not appear to us that the trial court ever addressed it. **See** PKA's Memorandum Regarding Reasonableness of Attorneys' Fees and Costs, 3/29/19, at 11-12. Consequently, we vacate the trial court's judgment, and

_____

[15] We note that the trial court "did not write an explanation" for its award of attorneys' fees and costs until its Rule 1925(a) opinion. **See** RO at 6.

[16] **See also** PKA's Reply Brief at 23 (asserting that the trial court "found that one of the breaches was under Section 5.05(a) of the Merger Agreement, which constituted a breach of a *covenant* and *affirmative obligation*, not a mere representation or warranty. As a result, the shareholders' obligation to indemnify falls under Section 8.02**(b)** of the Merger Agreement, which is not subject to the limitations of Section 8.04(a)(i)…") (emphasis in original); **see also** TCO at 8-9, 10 (finding that the Company and the selling shareholders are liable for breaching Section 5.05(a) of the Merger Agreement, which "required the Company to notify PKA of any 'fact, circumstance, event, or action' that could either have had a Material Adverse Effect on the Company, or which could have resulted in one of the Company's above representations and warranties not being true and correct") (citation omitted).

remand for it to ascertain whether Section 8.04(a)(i)'s limitations apply given the breaches made by the selling shareholders. If it finds Section 8.04(a)(i)'s limitations indeed apply, the trial court should reduce PKA's judgment by $50,000, in light of that provision's requirements.

Judgment vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/1/2020